UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARIEL DAN BARKAI,

                              Plaintiff,

        v.

DETECTIVE ROBERT NUENDORF, *et al.*,

                              Defendants.

No. 21-CV-4060 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Ariel D. Barkai
Weston, FL
*Pro Se Plaintiff*

Darius P. Chafizadeh, Esq.
Mathew T. Dudley, Esq.
Harris Beach PLLC
White Plains, NY
*Counsel for Defendants Robert Nuendorf, Tom Walsh, Lou Falco, Captain Descalsis, Sheriff's
Deputy Leonard, John Scanlon, Rockland County Sheriff's Department, County of Rockland, and
Other Unnamed John Doe Employees RCDAO*

John M. Flannery, Esq.
Eliza M. Scheibel, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY
*Counsel for Defendants Anthony Culianos, Ray McCaullugh, Jeff Wannamaker, Lt. Cummings,
and G. Hoehmann*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Ariel Dan Barkai ("Plaintiff"), proceeding pro se, brings this Action pursuant to

42 U.S.C. § 1983 ("§ 1983"), against the Rockland County District Attorney's Office

("RCDAO") Detective Robert Nuendorf ("Neuendorf"),[1] Rockland County District Attorney

Tom Walsh ("Walsh"), Other Unnamed John Doe Employees at RCDAO ("RCDAO John

Does"; collectively with Neuendorf and Walsh, "RCDAO Defendants"); Rockland County

Sheriff's Department ("RCSD"), RCSD Sheriff Lou Falco ("Falco"), RCSD Sheriff's Deputy

Leonard ("Leonard"), RCSD Captain Descalsis ("DeColyse"),[2] RSCD Detective John Scanlon

("Scanlon"), County of Rockland ("Rockland County"; collectively with RCSD, Falco, Leonard,

DeColyse, and Scanlon, "RCSD Defendants"; collectively with RCDAO Defendants, "Rockland

Defendants"), Clarkstown Police Department ("CPD") Police Officer ("PO") Anthony Culianos

("Culianos"), CPD Chief of Police Ray McCallugh ("McCallugh"), CPD Captain Jeff

Wannamaker ("Wannamaker"), CPD Lieutenant Glenn Cummings ("Cummings"), Clarkstown

Town Supervisor George Hoehmann ("Hoehmann"; collectively with Culianos, McCallugh,

Wannamaker, and Cummings, "Clarkstown Defendants"), CPD Dispatcher Monihan

("Monihan"), CPD Officer Donnegan ("Donnegan"; collectively with Monihan, "Other

Clarkstown Defendants"), Montefiore Nyack Hospital ("MNH"), MNH CEO Mark Geller

("Geller"), MNH Head of Patient Services Kristin DeLorenzo ("DeLorenzo"), MNH Head of

Security Jim Hastings ("Hastings"), MNH Nurse Tom Nguyen ("Nguyen"; collectively with

MNH, Geller, DeLorenzo, and Hastings, "MNH Defendants"), Orangetown Police Department

("OPD"), OPD Chief of Police Donald Butterworth ("Butterworth"), OPD Detective Sergeant

Anthony Palazolo ("Palazolo"), OPD Detective Dan Ryan ("Ryan"), and OPD Officer Ben

---

[1] Plaintiff appears to have misspelled Detective Neuendorf's name in the original Complaint.  (*See* Mem. of Law in Supp. of Mot. ("Rockland Mem.") 1 (Dkt. No. 146).)

[2] While Plaintiff identified this Defendant as Captain Descalsis, the Captain at issue is named Captain Antoine DeColyse.  (*See* Rockland Mem. 1.)

2

Gorcynzski ("Gorcynzski"; collectively with OPD, Palazolo, and Ryan, "OPD Defendants"), alleging that Defendants violated his constitutional rights by, inter alia, maliciously prosecuting Plaintiff for harassment, detaining Plaintiff for a mental health evaluation pursuant to N.Y. Mental Hygiene Law § 9.41, and subsequently arresting Plaintiff for an alleged threat upon the RCDAO.  (*See generally* Am. Comp. ("FAC") (Dkt. No. 78).)[3, 4]  Before the Court are two motions to dismiss: (1) Clarkstown Defendants' Motion to Dismiss; and (2) Rockland Defendants' Motion to Dismiss.  (*See* Defs' Not. of Mot. ("Clarkstown Not. of Mot.") (Dkt. No. 29); Defs' Not. of Mot. ("Rockland Not. of Mot.") (Dkt. No. 144).)[5]  For the foregoing reasons, the Clarkstown Defendants' Motion To Dismiss is granted in part and denied in part, and the Rockland Defendants' Motion To Dismiss is granted.

---

[3] The Court granted Plaintiff's request to withdraw any due process related claims as to Hoehmann on February 8, 2022.  (*See* Dkt. No. 111.)  Plaintiff reiterated this request in his Second Amended Complaint ("SAC"), now extending it to all claims against Hoehmann. (Second Am. Compl. ("SAC") 4 (Dkt. No. 114-1).)  The Court grants this request in full and dismisses Hoehmann from this Action.

[4] Although "an amended complaint ordinarily supersedes the original and renders it of no legal effect," *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)), "[g]iven Plaintiff's pro se status . . . the Court will consider both the [First and Second] Amended Complaint and [original] Complaint together, *Guy v. MTA N.Y.C. Transit*, 403 F. Supp. 3d 131, 133 (E.D.N.Y. 2017) (considering the pro se plaintiff's third amended complaint and first amended complaint together where the third amended complaint omitted facts pled in the first amended complaint).

[5] Plaintiff's initial Complaint included the following Defendants: Neuendorf, Culianos, McCallugh, Wannamaker, Cummings, Hoehmann, Donnegan, Monihan, and RCDAO John Does.  (*See* Compl.)  Plaintiff amended, adding several Defendants who were ultimately not served in this litigation.  (*See* FAC.)  The Court notes that the following Defendants have not been properly served: Monihan, Donnegan, Geller, MNH, DeLorenzo, Hastings, Nguyen, Butterworth, OPD, Palazolo, Gorcynzski, and Ryan.

<u>I.  Background</u>

A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaints and associated filings are assumed to be true for the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).[6]

1.  Orangetown Police Department Harassment Charges

On January 27, 2020, Plaintiff's mother passed away at MNH.  (FAC 1.)  Plaintiff alleges that, at some time after his mother's death, Plaintiff went to MNH to obtain his mother's medical records.  (*Id.* at 6.)  At the time, Plaintiff spoke with Hastings and DeLorenzo who indicated that they were interested in launching an internal investigation about Plaintiff's mother's death.  (*Id.*)  Plaintiff alleges that he "exchanged several emails with DeLorenzo and she called [him] several times," alleging that he sent DeLorenzo a total of eleven emails.  (*Id.*; *see also id.* at 17 ("I sent

_____

[6] When reviewing a complaint submitted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks and citation omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

Here, Plaintiff has filed *numerous* documents throughout the pendency of this two-year case.  In addition to several audio and visual recordings that the Court has already ruled that it will consider in deciding the instant Motions, (*see* Dkt. Nos. 63, 166), the Court will consider the documents provided by Plaintiff to the extent they are consistent with the allegations in the Complaint.  The Court also notes that both the Rockland and Clarkstown Defendants attached Exhibits to their respective motions.  (*See* Dkt. Nos. 30, 145.)  These Exhibits are duplicative of those attached by Plaintiff and thus will be considered by the Court.

DeLorenzo 11 emails.  She sent me 5.").)  On February 18, 2020, DeLorenzo filed a criminal

complaint for harassment in the second degree against Plaintiff in which she alleged that Plaintiff

"sent her '11 emails which served no legitimate purpose other than to cause annoyance and

alarm and [that] were outside the scope of her professional duty.'"  (*Id*. at 6 (emphasis omitted);

*see also id.* at 19.)  Plaintiff alleges that Gorcynzski at OPD took DeLorenzo's complaint.  (*Id*. at

19.)  Plaintiff alleges that DeLorenzo "act[ed] in full knowledge of CEO Mark Geller" when she

knowingly lied about the harassment allegations, which Plaintiff alleges was an act of First

Amendment retaliation and a violation of due process through malicious prosecution.  (*Id*. at 18.)

Finally, Plaintiff alleges that he sent "a few more emails to DeLorenzo" on February 28, 2020,

after Hastings sent a cease-and-desist letter to Plaintiff.  (*Id*. at 19.)  However, Plaintiff alleges

that, because he was travelling in Israel, he did not receive the letter until it was emailed to him

by another hospital employee on February 28, 2020.  (*Id*. at 19–20.)[7]

On or around March 7, 2020, Plaintiff raised his complaints regarding his mother's death

to Geller, who Plaintiff alleges passed the complaints to Nguyen, a nurse involved in his

mother's care.  (*Id*. at 6, 20.)  Nguyen then also filed a criminal complaint for harassment against

Plaintiff on March 10, 2020.  (*Id*. at 6, 8.)  Plaintiff alleges that Nguyen "lied to the police saying

that [Plaintiff] sent 22 emails that served no legitimate purpose but to cause annoyance and

alarm," and that Nguyen also "lied claiming that [Plaintiff] called [Nguyen's] unit on a day he

---

[7] Plaintiff also alleges that he spoke to local police in Israel and believed that he was "not
bound by the cease[-]and[-]desist [letter]."  (*Id*. at 20; *see also* Mem. of Law in Opp. to Mot.
("Pl's Rockland Opp.") Ex. H at 3 (Dkt. No. 151-8) ("So I am begging you to reconsider what I
have written here and contact me directly before I return from Israel on March 17th because once
I return I will be left no choice but to seek counsel as your security has 'informed' me not to
communicate with your staff (something which I am not obliged to do from the State of Israel
but will adhere to upon my return).").)

was scheduled to work and made further harassing comments about [Nguyen]." (*Id*. at 6 (quotation marks omitted).) Plaintiff alleges that, "after the night [his] mom died, at no time did [Plaintiff] ever attempt to contact or communicate with Nguyen in any way." (*Id*. at 7; *see also id.* at 20.) However, Plaintiff admits to looking at Nguyen's professional page on LinkedIn, which Nguyen "later claimed he found . . . threatening." (*Id*. at 7.) Plaintiff alleges that Nguyen "filed these charges . . . to retaliate against [Plaintiff] in violation of New York State Law." (*Id*.)

On April 8, 2020, Plaintiff was contacted via email by OPD Detective Ryan who informed Plaintiff that he was being charged with harassment and was subject to a restraining order. (*Id*. at 22.) Plaintiff alleges that OPD and the RCDAO "engaged in a malicious prosecution against" him by pursuing the two charges of harassment. (*Id*. at 7.) Specifically, Plaintiff alleges that OPD "advanced fraudulent harassment charges" without investigation or probable cause, because OPD allegedly never read the fraudulent emails underlying the harassment claims. (*Id*.)[8] Plaintiff alleges that he met with Butterworth and Palazolo on or about June 10, 2020, who both "admitted they never read the emails and now that they had[,] . . . they did not constitute harassment." (*Id*. at 7; *see also id.* at 22.) Plaintiff alleges that after this meeting, OPD "alerted the RCDAO that they no longer support the charges having finally read the emails," however RCDAO "refused to drop the charges in violation of the rules of the Court of the State of NY 3.8(a) Special Rules for Prosecutors regarding probable cause." (*Id*. at 9.) The two charges of harassment in the second degree were dismissed at Plaintiff's arraignment on or about August 11, 2020. (*Id*. at 10, 23; *see also* Pl's Rockland Opp. Ex. C at 1–2 (Dkt. No. 151-3) (certificates of disposition); Pl's Rockland Opp. Ex. D at 1 (Dkt. No. 151-4) ("On August

---

[8] Plaintiff alleges that he was the one to provide the allegedly harassing emails to Palazolo. (*Id*. at 7.)

11, 2020 you were arraigned on [two counts of harassment in the Second Degree], and the District Attorney moved to dismiss both counts of Harassment . . . .  The court then dismissed both counts . . . .").)  Plaintiff alleges that RCDAO should have ensured that OPD had "done a simple investigation by reading the emails and getting [his] side of the story as they are lawfully obligated to do" and, had RCDAO done this, charges would not have been brought.  (*Id*. at 9.)

Plaintiff alleges that, "[b]y taking sides in a civil dispute and charging [Plaintiff] criminally with zero probable cause and refusing to drop the charges in spite of the fact that he knew [Plaintiff] was being denied an [Small Business Administration Economic Injury Disaster Loan] [Plaintiff] desperately needed from the CARES Act, . . . Walsh violated his oath by showing favor and affection to [MNH] and failed to treat [Plaintiff] and [his] family fairly and with dignity."  (*Id*. at 9 (quotation marks omitted); *see also id*. at 23.)  Plaintiff also alleges that, on or about August 31, 2020, his CARES Act loan was indeed funded.  (Compl. 14 (Dkt. No. 2) ("[M]y EIDL loan was finally funded; the same loan denied me by the false charges . . . Walsh maliciously prosecuted on.").)

### 2.  Clarkstown Police Department Mental Hygiene Law Seizure

On August 21, 2020, Plaintiff alleges that he had a conversation with Detective Neuendorf where Neuendorf stated that "he was the only person in the DA's office with whom [Plaintiff] should speak."  (Compl. 9.)[9]  On this call, Plaintiff alleges that Neuendorf told

---

[9] Plaintiff provided the Court with a 55-minute recording of this call, which has been reviewed and incorporated as relevant to the instant Action.  (*See* Letter from Ariel Barkai to Court (April 29, 2022) ("Rockland Recordings") Ex. ("Neuendorf Call") (Dkt. No. 154).)  While the Court did not identify this exact statement from the call, the following relevant exchanges occurred:

> Neuendorf:  So here's, let me sort of run through everything here.  I'm obviously going to communicate this phone call to [Walsh].  [Walsh] does not take phone calls from people. . . . Whether you agree with it, whether I agree with it or not, that's, I'm sort of the guy when people have complaints and call in.

Plaintiff that "[Walsh] will not apologize.  He is afraid you are going to sue him."  (FAC 23–24;
*see also* Compl. 9–10.)[10]  Plaintiff alleges that the prosecution of the harassment charges "had
nothing to do with the law or [t]he Constitution" but instead "had to do with . . . Walsh operating
his office like it was a private fiefdom w[h]ere decency, justice[,] and the rule of law take a back
seat to his privilege[] and power."  (FAC 24.)

Over the next ten days, Plaintiff alleges that he periodically called Neuendorf's mobile
phone and could not reach him.  (Compl. 9.)  On August 31, 2020, Plaintiff called the RCDAO
to speak with Neuendorf, but instead was instructed to leave a message with a receptionist.  (*Id*.)
Plaintiff alleges that he "told the assistant that [he] wanted to speak to [Neuendorf] about getting
his assistance in settling an issue with [his] EZ pass which had gone into default as a result of
having been denied an Economic Injury Disaster Loan from the [Small Business Administration]
due to the false charges brought against [Plaintiff] by [Neuendorf's] boss, . . . Walsh."  (*Id*.)
Plaintiff alleges that the receptionist instructed Plaintiff to leave a message with her for

---

[ . . . ]
Neuendorf: . . . I'm going to give you my number at the desk here.  I hope you don't have
to, but . . . in the future, not tomorrow, not next week, but in the future, if you're having a
tremendously bad day, call me. Stay focused.
[ . . . ]
Neuendorf: [ . . . ] If you need to call, you're gonna call me.
(*Id*. at 19:43–20:32; 24:40–25:05; 51:20–51:23.)

[10] As per the recording of the call provided by Plaintiff, the Court identifies the following
exchange as relevant to Plaintiff's allegations:
Neuendorf: [ . . . ] Now, I will tell [Walsh]what you are asking, but you know what the
answer is going to be, you're not getting an apology from him.
Plaintiff: [unintelligible]
Neuendorf: He's gonna think, you know, once he apologizes, this is going to lend to
litigation—
Plaintiff: No, no, no no, hear me out for one second.  Ask [Walsh], tell him to call Chief
Butterworth.  Chief Butterworth and myself and Detective Palazolo sat down and we
spoke, ok? And they  . . . admitted that they screwed up . . . .
(Neuendorf Call 25:07–25:49.)

Neuendorf, and when he was explaining why he wanted to speak with Neuendorf, the receptionist hung up on him.  (*Id*. at 10.)  Plaintiff alleges that "at no time did [he] threaten [the receptionist] nor did [he] threaten [him]self or ideate suicide in any manner what so ever [sic]." (*Id*.)

According to a FOIA request initiated by Plaintiff, Neuendorf called CPD approximately 20 minutes after the call with the receptionist and spoke with Dispatcher Monihan.  (*Id*. at 13–14.)  On this call, Neuendorf allegedly told Monihan that Plaintiff had "made suicidal threats to the DA" on the call with the receptionist, that Plaintiff "sounded depressed and was being suicidal," and requested that CPD conduct a welfare check on Plaintiff.  (*Id*. at 13–14 (quotation marks omitted); *see also* Compl. Ex. A ("Culianos Rpt.") (Dkt. No. 2-1) (narrative from Culianos stating that he was "informed by CPD Dispatch" that RCDAO "contacted CPD requesting a welfare check" after "an employee from the DA's office stated that [Plaintiff] had contacted the DA's office stating that he was 'depressed and being suicidal'").)  Monihan then dispatched CPD officers to respond to Plaintiff's home for a welfare check.  (Compl. 14.)

At approximately 2:00 PM, Plaintiff joined a recorded business call from his home in Upper Nyack, New York, where the parties were discussing a proposed construction contract worth $2.4 million in commissions for Plaintiff.  (*Id*. at 10.)  Approximately five minutes later, Officer Donnegan responded to Plaintiff's home, knocking on his front door.  (*Id*.)  Plaintiff opened the door while holding his phone, which recorded the majority of the incident in question.  (*Id*.)  Plaintiff asked Donnegan whether she had a warrant or court order to be at his home; when she replied that she did not have either, Plaintiff said "not now," told Donnegan to leave his property, and shut the door.  (*Id*.)  Plaintiff then reopened the door with the phone on speakerphone mode, put the phone up to Donnegan's ear, and told her that "[t]his is a

$130,000,000 call.  You will have to come back."  (*Id*. at 10–11.)  Plaintiff alleges that she

responded "No. . . .  Can I just ask you some questions?"  (*Id*. at 11.)  Plaintiff responded "No.

Are you on drugs?  This is a $130,000,000 call.  Get off my property."  (*Id*.)  Plaintiff alleges

that Donnegan again refused to leave and "refus[ed] to tell [Plaintiff] why she was there."  (*Id*.)[11]

When Donnegan again refused to leave, Plaintiff went inside and put down his two phones and

stated "get off my property" in a "commanding voice."  (*Id*.)[12]  Plaintiff alleges that, upon arrival

at his home, Donnegan should have "ascertained immediately" that Plaintiff was not suicidal as

reported by the dispatcher and concluded that Plaintiff did not pose "a substantial risk to

[himself] or someone else."  (*Id*. at 13.)

---

[11] Plaintiff alleges that this is in contrast with a different visit by CPD pursuant to New York's Mental Hygiene Law.  Plaintiff alleges that, on March 15, 2021, Officer Owen Davies of CPSD visited his home, "announced the purpose of his visit," and Plaintiff "invited him in[to his] home."  (*Id*.)

[12] Plaintiff also provided the Court with an audio recording of the incident that took place on August 31, 2020.  (*See* Letter from Ariel D. Barkai to Court (Nov. 2, 2021) ("Nov. 2021 Audio Files") Ex. ("Aug 2020 Recording") (Dkt. No. 69).)  Approximately five minutes into the recording, a knock on Plaintiff's door can be heard.  (Aug 2020 Recording at 5:22.)  Plaintiff appears to open the door, and the following interaction occurs:
>       Donnegan: "How are you doing"
>       Plaintiff: "Good."
>       Donnegan: "Who is that?"
>       Plaintiff: "Work."
>       Donnegan: "Can I come in?"
>       Plaintiff: "No, not now, not now, not now.  Please leave my property, leave my property."

(*Id*. at 5:38–5:50.)  Plaintiff closes the door and reopens the door, stating: "This is a 130-million-dollar call, come back. . . come back in 30 minutes."  (*Id*. 5:52–6:02.)  Plaintiff then reopens the door and tells Donnegan "this is a 130 million dollar call you'll have to come back."  (*Id*. 6:16–6:21.)  Then, the following exchange occurs:
>       Donnegan: "Ok, can I just ask you a few questions?
>       Plaintiff: "No, no, not now. No."
>       Donnegan: "Just a few questions.  Just a few questions."
>       Plaintiff: "No, no.  This is a 130-million-dollar call, are you on drugs?  Get away from me."

(*Id*. 6:21–6:33.)

At approximately 2:08 PM, a second CPD officer, Officer Culianos, responded to the scene at Plaintiff's home.  (*Id*. at 11.)[13, 14]  Plaintiff mistook Culianos for a different CPD officer he was familiar with because this officer had visited Plaintiff's home in June 2020 prior to Plaintiff leaving for a business trip in the Dominican Republic.  (*Id*.)  Plaintiff asked Culianos "can you please tell this officer that I am on that conference call for the deal I went to the Dominican Republic for.  Its [sic] going on right now."  (*Id*.)[15]  Plaintiff alleges that Culianos said "[the other CPD officer] is not your private . . . cop and I don't like the way you are speaking to my partner."  (*Id*.)  Plaintiff alleges that Culianos then "grabbed [Plaintiff] and assaulted [him] by slamming [him] against the wall of [his] home face first."  (*Id*.)[16]  As Culianos went to handcuff Plaintiff, Plaintiff alleges that Culianos yelled "he is not resisting." (*Id*.)  Plaintiff alleges that Culianos placed Plaintiff in the back of his car.  (*Id*. at 12.)  Prior to leaving for MNH, Plaintiff alleges that Culianos entered Plaintiff's home while he was in the police car and yelled "[p]olice [d]epartment anybody home."  (*Id*. at 13; *see also* Aug. 2020

---

[13] Plaintiff's interactions with Culianos are unintelligible on Plaintiff's audio recording. (*See generally* Aug. 2020 Recording.)  However, the recording does pick up Plaintiff reopening his door as well as yelling in the background.  (*See id*. 6:40–7:37.)

[14] Culianos stated in a report that he "observed Officer Donnegan on the front porch with [Plaintiff.]  [Plaintiff] appeared to be highly agitated and was observed pacing, flailing his hands and arms around, and yelling."  (Culianos Rpt. 1.)  Plaintiff alleges that Culianos's report is false.  (Compl. 14.)

[15] Culianos stated that he "asked [Plaintiff] to speak with [him] about [Plaintiff's] conversation with the DA's office, and instead he charged towards [Culianos] at a fast pace, flailing his arms as he continued screaming and yelling incoherently."  (Culianos Rpt. 1.)

[16] Culianos stated that Plaintiff "turned around and attempted to walk into the residence," and "[d]ue to having limited information about how [Plaintiff] was 'being suicidal,' [Plaintiff's] erratic behavior, and for other officer safety reasons, [Culianos] held [Plaintiff's] arms[] while [] Don[n]egan placed him in hand cuffs."  (Culianos Rpt. 1.)

Recording 11:12–11:30 ("Hello, police department.  Is anyone in the house?  Hello?").)  Plaintiff alleges that he learned two months later that "this act trashed [the] deal and cost [Plaintiff] a $2,400,000 contractual payout."  (Compl. 13.)

At this time, Plaintiff was brought to MNH.  (*Id*. at 12.)  Plaintiff alleges that he "screamed at [Culianos] not to take [him] there" and instructed Culianos to bring him to a different hospital."  (*Id*.)[17]  Plaintiff alleges that he "feared for his life" and was concerned that MNH would "take [him] into some Covid unit and drug [him] and kill [him]" which is what he alleges happened to his mother.  (*Id*.)  Plaintiff also alleges that he was "completely paranoid" and "freaked out," and states that he was "clearly . . . in a manic state."  (*Id*.)  Plaintiff alleges that Culianos dropped Plaintiff off at MNH, where Culianos told hospital staff that "[t]he Rockland DA want[s] him brought here."  (*Id*.)  Plaintiff was then placed into a psychiatric room for observation and testing, and remained at MNH for four days.  (*Id*. at 12–13.)

Finally, Plaintiff alleges that he "filed criminal charges" on October 15, 2020 but "the Clarkstown Police never investigated."  (*Id*. at 15.)  Plaintiff alleges that he spoke with several individuals at CPD, including Lieutenant Cummings who "sent [Plaintiff] some letter which fiends an investigation but is really just an attempt to cover for Culianos' and [Neuendorf's] criminal actions."  (*Id*.)  Plaintiff also alleges that he tried to call CPD Captain Wannamaker and Chief of Police McCallugh, but they "refused to take [Plaintiff's] call."  (*Id*.)  Plaintiff also alleges that he reached out to Clarkstown Town Supervisor Hoehmann and the town attorney,

---

[17] Culianos stated that, en route to MNH, Plaintiff "continued to yell obscenities and scream incoherently," yelling about "the death of his mother and a multimillion-dollar conference call that [Plaintiff] was in the middle of."  (Culianos Rpt. 1.)  Culianos stated that Plaintiff "continued his erratic actions" as Plaintiff was escorted into the hospital.  (*Id*.)

"but they claimed that since [Plaintiff] filed a notice of claim they could not speak to [him] either." (*Id*.)

### 3. Plaintiff's Arrest on August 24, 2021

Plaintiff alleges that, on February 4, 2021 "when it [became] clear the CPD had no intention to investigate" his claims for criminal prosecution, Plaintiff served a notice of claim on the Clarkstown Town Attorney, giving notice of Plaintiff's impending federal lawsuit related to Plaintiff's detainment. (FAC 25; *see also* Compl. Ex. B ("Feb. Not. of Claim") (Dkt. No. 2-1).) Plaintiff alleges that, after filing the civil action before this Court, he "cut all communication" with members of CPD who were participants in the incidents at issue, but he spoke to Detective Alexandre Ramirez from the New York State Attorney General's Office ("NYSAG") in early August 2021 to ask that office to "investigate the criminal component of this suit." (FAC 25.)

In a telephone conversation on August 24, 2021, Plaintiff alleges that he made a comment to Detective Ramirez that was a "crude form of rhetorical hyperbole." (*Id*. at 10.) Plaintiff alleges that during this conversation, Detective Ramirez told Plaintiff that "there was nothing he could do" about Plaintiff's allegations that "Culianos assaulted [Plaintiff] in [his] home." (*Id*. at 25.)[18] In response, Plaintiff said that he could "see how people snap and do crazy things and since [Plaintiff] is half Israeli[,] [Plaintiff] looked at it through the perspective of terrorist

---

[18] According to a purported transcript of the call, Detective Ramirez told Plaintiff that "the proper way to [raise this complaint] it's [sic] through the, what they call the LEMIO office there, which is the law enforcement misconduct investigative office. . . that will provide you with civil remedies. Unfortunately, we actually don't have a criminal authority over the district attorney or the officers unless it stems from . . . deaths in custody." (Pl's Rockland Opp. Ex. P ("Ramirez Call Tr.") at 3 (Dkt. No. 151-16).) Ramirez also instructed Plaintiff to call CPD or RCSD and request their internal affairs bureaus. (*Id*. at 4.) After Plaintiff expressed frustration that he would be returning to the departments who he alleged violated his rights, Ramirez stated that Plaintiff could file a Freedom of Information Act ("FOIA") Request. (*Id*. at 5–6.)

actions." (*Id.*)  Based on a purported transcript of the call provided by Plaintiff, Plaintiff said the

following:

> Yeah. I mean, you know what the problem is here—you know what the problem is
> here.  People snap all the time in the world, people snap all the time in the world.
> And this-this is just so-so terribl[e].  I-I don't know what the word is that honestly,
> I'm not going to do it.  I'm not threatening anybody.  I want it to be clear that what
> I'm about to tell you is simply for the- for the- for the elite- to illiterate [sic] a point.
> If I were to walk into the [RCDAO], after going to Gaza, I'm Israeli.
>
> So I'm obviously not pro Palestinian.  I'm obviously not pro Hamas, but if I went
> to Gaza and indoctrinated myself into suicide bombing and walked into the district
> attorney's office and blew myself up, nobody could blame me, but I will not do
> that.  I will not do that.  But these laws, what you are doing is you are creating in
> people hate and-and frustration, and you are letting people have their rights abused.
> You are letting people be basically raped by the state with no repercussions, no
> repercussions whatsoever.

(Ramirez Call Tr. 7.)  Plaintiff alleges that he "specifically prefaced what [he] said by saying

[he] was not making a threat."  (FAC 25.)

Shortly after the call at 11:20 AM, Detective Ramirez memorialized the call in an email

to other members of the NYSAG.  (*See* Pl's Rockland Opp. Ex. O ("Ramirez Email") (Dkt. No.

151-15).)  In the email, Ramirez started by saying that, "[w]ithout mincing words, Mr. Barkai is

an EDP."  (*Id.* at 3.)[19]  In relevant part, Ramirez recounted the incident as follows:

> Before the call disconnected, Mr. Barkai began ranting about being of Israeli
> descent and began comparing himself to a member of Hamas.  Specifically, he
> stated that "I'm not saying I would, but if I were to walk into the [RCDAO] like a
> Hamas suicide bomber, no one could blame me."  This is the only comment that
> gave me some pause as during the call his rhetoric escalated progressively to this
> comment and stated that he would be going there (to the DA's office) to complain
> and demand answers.  He appears to be known to [CPD] based on his comments
> and he may possibly be known to the [RCDAO].  It would be my suggestion to

---

[19] The Court understands "EDP" to mean "emotionally disturbed person."  *See*
*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 374, 379 (S.D.N.Y. 2013) (discussing
several "emotionally disturbed person calls" involving a defendant and identifying a police
department's policy related to the same).

have [CPD] conduct a wellness check on this individual and that the DA's office at least be alerted to the veiled threats being made.

(*Id.*)  Plaintiff also alleges that someone at the RCDAO told RCSD Detective Scanlon that Plaintiff was on his way to the RCDAO "to shoot the place up."  (FAC 26.)  Finally, Plaintiff alleges that "Walsh may deny his involvement in the events of August 31[,] 2020 but he is directly implicated in the emails of August 24[], 2021 so he cannot claim he was no[t] involved[,]" positing that Walsh is "'[t]he Judge' and clearly he orchestrated all of this."  (*Id.* 13–14.)

Assistant Chief Rivera at NYSAG forwarded Ramirez's email to another individual, asking him to assign a detective to follow up with CPD and "make them aware of the threat." (Ramirez Email at 2.)  After a series of email forwards, (*see id.* at 1–2), the email finally reached RCSD Cpt. DeColyse, (*see id.* at 1).  Plaintiff alleges that he spoke with DeColyse shortly thereafter, telling DeCoylse that he "never threatened anyone" and that he "possessed a recording of the call itself which proves it."  (FAC 11.)[20]  Plaintiff alleges that DeColyse told him that

---

[20] Plaintiff provided the Court with a recording of this call between Plaintiff and DeColyse, which has been reviewed and incorporated as relevant to the instant Action. Rockland Recordings Ex. ("DeColyse Call") (Dkt. No. 154).)  The following relevant exchange occurred:

> DeColyse: We heard from the DA's office that you were on the way there and so I wanted to know where you were exactly.
> Plaintiff: You heard from the DA's office that I was on the way there?
> DeColyse: Yes, I guess somebody from the AG's office called about it and said you are probably on your way there, so I just wanted to—
> Plaintiff: No no, I went to the Clarkstown PD earlier today to speak to Lieutenant Chernick. [ . . . ] I woke up this morning and I called the New York Attorney General's office.  I spoke to a gentleman there.  I asked him what I was supposed to do about a criminal complaint I filed regarding . . . Anthony Culianos and . . . Bob Neuendorf.  He told me that I was supposed to go to the clerk's office and talk to internal affairs . . . I went there and I talked to them and I left. [ . . . ]
> DeColyse: So right now, let me get this right, you are in Manhattan right now?
> Plaintiff: I'm at the federal courthouse in Manhattan.

"nobody was going to arrest [Plaintiff] on trumped up charges[,] and that they were in the business of public safety and just wanted to make sure everyone was safe." (*Id.*)[21]  In his complaints, Plaintiff alleges that an unidentified individual at the RSCD arrested him later that day. (*Id.* at 10–11.)  However, in opposition to the Rockland Defendants' instant Motion To

---

DeColyse: The federal courthouse in Manhattan.  Oh wow.  So you're nowhere near here.
Plaintiff: Not even close.  I never went anywhere near there, any allegation as such is a false allegation, . . . I'm suing the district attorney's office, I'm not going anywhere near there.  Now, just to be clear, I was told by the DA's office that I should go first to the police department, and you know now that's like stabbing me in the back . . . .
(*Id.* 00:22–2:15.)

[21] The Court recounts the following relevant exchange:
Plaintiff: What I want to know is why is it when I call the police department asking for their help and nobody does a g-d thing, but when I ask them for their help they call you to try to drum up some false charge like I'm going to the DA's office to to, you know [unintelligible]
DeColyse: [ . . . ] No, Ariel, don't, don't, don't jump to conclusions, I don't think anyone is drumming up a charge or anything –
Plaintiff: Why would someone call the Sheriff's Department and say that I was heading to the District Attorney's office when I in no way was I heading to the DA's office.
DeColyse: Well I told you . . . the origin, that the notification came from the AG's office.
Plaintiff: Again, it's a continued pattern of false allegations …
[ . . . ]
DeColyse: I think you're mixing us up with the department you had dealings with, you didn't have any such issue with us.  I'm just calling to make sure you're safe.
Plaintiff: What is the purpose of this call?
DeColyse: To make sure you're safe and to know where you were and to make sure everyone else is safe.  Public safety is our job, that's all, we just want to make sure everybody's safe.
[ . . . ]
Plaintiff: . . . After this, I'm going to tell you what the District Attorney told me, he's a son of a bitch, I want a recording of the conversation because I have a recording of my discussion with him.
DeColyse: Listen, you can come and sit down here, no problem you calm down and come over here—
Plaintiff: I'm a very calm person, I'm allowed to be upset, I'm not threatening or anything else, there is no lawful mooring that says you have to be calm, what it says is you can not make threats against yourself or anybody else, and I'm just standing up for my rights.  I recorded the conversation, and I will play it for you.
(DeColyse Call 2:35-3:13; 4:20–4:46; 4:57–5:30.)

Dismiss, Plaintiff alleges that he "called RCSD back at approximately 5PM to speak to De[C]olyse and spoke to Leonard[,] telling him exactly what was happening and that [Plaintiff] was in direct contact with De[C]olyse and that [Plaintiff] intended to present himself to RCSD [headquarters]." (Pl's Rockland Opp. 31.) Plaintiff further alleges that "Leonard appeared at Plaintiff[']s home to execute the . . . arrest" at 10PM. (*Id*.)

Plaintiff alleges that RCSD failed to conduct a "proper investigation" prior to his arrest, and Detective DeColyse "ignore[ed] exculpatory evidence" from the recording of the phone that would have "vitiated any probable cause to make an arrest." (FAC at 11; *see also id*. at 26 ("[T]he Sheriff's Office was made clearly aware of the existence of exculpatory evidence in the form of a recording of the call and without giving me a chance to present it to them though they were completely aware of its existing. . . .").) As such, Plaintiff alleges that the arrest violated the Fourth Amendment. (*Id*. at 11.) Moreover, Plaintiff alleges that Rockland County Sheriff Falco later told the press that Plaintiff "allegedly threatened to 'bomb the DA.'" (*Id*.) On October 27, 2021, Plaintiff alleges that the Westchester County District Attorney's Office dismissed the criminal complaint against Plaintiff. (*Id*. at 27.)

B. Procedural History

Plaintiff filed his initial Complaint on May 2, 2021. (*See* Compl.) On July 23, 2021, the Clarkstown Defendants filed a pre-motion letter in anticipation of filing a motion to dismiss. (Dkt. No. 16.) In lieu of a pre-motion conference, the Court adopted a briefing schedule in an Order on August 3, 2021. (Dkt. No. 17.) Plaintiff filed responses to the original pre-motion letter on August 16 and 17, 2021. (Dkt. No. 18; *see also* Dkt. No. 19.)

On August 24, 2021, Plaintiff filed a tripartite motion for: (1) injunction for a "federal override" of the New York state mental hygiene laws; (2) a request for a judicial "order of protection" for Plaintiff; and (3) a request for referral for criminal investigation to the US

Attorney's office.  (Dkt. No. 26.)  After receiving responses from Clarkstown Defendants and Rockland Defendants, (*see* Dkt. Nos. 28, 32), and receiving Plaintiff's reply, (*see* Dkt. No. 33), the Court denied Plaintiff's motion on September 8, 2021, (Dkt. No. 36.)

On September 2, 2021, Clarkstown Defendants filed their Motion to Dismiss.  (*See* Clarkstown Not. of Mot.; Decl. of Eliza M. Scheibel in Supp of Mot. (Dkt. No. 30); Clarkstown Mem.)  On October 6, 2021, Plaintiff filed a motion to submit audio and video recordings for consideration in connection with the Clarkstown Defendants' motion to dismiss.  (Dkt. No. 48.)  In addition, Plaintiff filed his Opposition to the Clarkstown Defendants' Motion on October 18, 2021.  (Pl's Mem. of Law in Opp. ("Pl's Clarkstown Opp.") (Dkt. No. 55).)[22]  After receiving responses from the Clarkstown and Rockland Defendants regarding the motion to submit recordings, (Dkt. Nos. 58, 62), the Court granted Plaintiff's motion, (Dkt. No. 63).  Plaintiff submitted the audio files on November 2, 2021.  (Nov. 2021 Audio Files.)  The Clarkstown Defendants filed their reply on November 5, 2021.  (Reply Mem. in Supp. of Mot. ("Clarkstown Reply") (Dkt. No. 70).)  After seeking leave from the Court, (Dkt. No. 73), Plaintiff filed a sur-reply on November 13, 2021, (Sur-Reply Mem. in Opp. ("Pl's Clarkstown Sur-Reply") (Dkt. No. 74)).

On September 27, 2021, Plaintiff filed a letter with the court providing an update on his criminal charges.  (Dkt. No. 38.)  On September 28, 2021, the Rockland Defendants responded to Plaintiff, requesting a pre-motion conference in anticipation of filing a motion to dismiss.  (Dkt. No. 39.)  In lieu of a pre-motion conference, the Court adopted a briefing schedule in an

---

[22] Plaintiff previously filed an Opposition with a page length that exceeded this Court's Individual Rules of Practice.  (Dkt. No. 43).  After a motion by the Clarkstown Defendants, (Dkt. No. 45), the Court struck the filing and instructed Plaintiff to refile, (Dkt. No. 50).

Order the same day.  (Dkt. No. 40.)  However, on October 15, 2021, Plaintiff sought leave from

the Court to amend his complaint, adding additional defendants and facts related to the MNH

Defendants and the OPD Defendants.  (Dkt. No. 52.)[23]  After receiving responses from the

Clarkstown and Rockland Defendants, (*see* Dkt. Nos. 59, 64), the Court granted Plaintiff's

request to amend his Complaint on October 26, 2021, (Dkt. No. 67).

Plaintiff filed his Amended Complaint on November 28, 2021.  (FAC.)  On December 6,

2021, Plaintiff moved to consolidate this Action with another case filed against other government

officials before this Court, *Barkai v. Mendez*, No. 21-CV-4050 (S.D.N.Y.).  (*See* Dkt. No. 79.)

In light of pertinent concerns regarding the timeliness of motions in the respective actions, the

fear of juror confusion, undue discovery burdens, and several important differences in the

conduct at issue underlying the claims, the Court denied the motion to consolidate.  (*See* Dkt.

No. 87.)

On December 13, 2021, the Clarkstown Defendants filed a pre-motion letter in

anticipation of filing a motion to dismiss.  (Dkt. No. 82.)  Shortly thereafter, Plaintiff filed a

motion to add an appendix to the Amended Complaint on December 25, 2021, (*see* Dkt. No. 88),

which the Court granted on January 3, 2022, (Dkt. No. 92).  Plaintiff filed said appendix on the

same day.  (Dkt. No. 93.)  Plaintiff also filed a motion to amend the FAC to add the Town of

Clarkston as a Defendant on January 1, 2022, (*see* Dkt. No. 90), and a motion to amend the

remedies sought in the FAC, (*see* Dkt. No. 96).  After receiving responses from the Clarkstown

and Rockland Defendants, (*see* Dkt. Nos. 100–02), the Court granted Plaintiff's request to amend

---

[23] Plaintiff underscored that he planned to continue to reply to the Clarkstown
Defendants' pending motion, as "they we[re] not involved in the original degradation of [his]
rights done to [him] by Nyack Hospital, [t]he Orangetown Police Department[,] and . . . Walsh's
office."  (*See* Dkt. No. 52 at 2.)

his claim and denied his request to add the Town of Clarkstown, (*see* Dkt. No. 107).  The Court also denied the Clarkstown Defendants' pending pre-motion letter as moot, given the forthcoming amended complaint.  (Dkt. No. 112.)

On January 29, 2022, Plaintiff filed his SAC.  (SAC.)  On February 11, 2022, the Clarkstown Defendants filed a pre-motion letter in anticipation of filing a motion to dismiss. (Dkt. No. 113.)  After receiving Plaintiff's response on February 15, 2022, (Dkt. No. 115), the Court set a briefing schedule in lieu of holding a pre-motion conference, (Dkt. No. 117).

On April 19, 2022, the Rockland Defendants filed their instant Motion.  (*See* Rockland Not. of Mot.; Decl. of Darius P. Chafizadeh in Supp. of Mot. (Dkt. No. 145); Rockland Mem.) Plaintiff filed his Opposition on April 29, 2022.  (*See* Pl's Rockland Opp.; Rockland Recordings.)  Rockland Defendants filed their Reply on May 13. 2022.  (*See* Reply Mem. in Supp. of Mot. ("Rockland Reply") (Dkt. No. 155).)  After seeking leave from the Court, (*see* Dkt. No. 159), Plaintiff filed a sur-reply on May 23, 2022, (Sur-Reply Mem. of Law. in Further Opp. ("Pl's Rockland Sur-Reply") (Dkt. No. 160)).

Finally, on November 24, 2022, Plaintiff filed a motion to amend his complaint a third time.  (Dkt. No. 178.)  After receiving a response from the Clarkstown and Rockland Defendants, (Dkt. Nos. 180, 181), and an additional filing by Plaintiff, (Dkt. No. 182), the Court denied the Motion given the pending Motions To Dismiss, (Dkt. No. 183).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).  But when a plaintiff proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint."  *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).  Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

    B.  Analysis

    Plaintiff asserts a number of claims arising from the events described above, including violations of his rights under the First, Fourth, Fifth, and Fourteenth Amendments.  (*See generally* Compl; FAC.)  The Court begins by reviewing Plaintiff's allegations regarding certain individual Defendants to determine whether Plaintiff has sufficiently pled they were personally

involved in the alleged Constitutional violations; thereafter, the Court reviews each cause of action, as well as the arguments related thereto raised by the Parties.

### 1.  Personal Involvement

Both the Clarkstown Defendants and the Rockland Defendants argue that Plaintiff has failed to establish the personal involvement of various Defendants in the alleged Constitutional violations.  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)).  "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citation and quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement, because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant).

The Clarkstown Defendants argue that "Plaintiff's allegations against [D]efendants Cummings, Wannamaker, McCullagh, and Hoehmann fail to allege personal participation in any constitutional violation."  (Clarkstown Mem. 20.)[24]   In addition, the Clarkstown Defendants argue that "even if Dispatcher Monihan had been properly served in this matter, the claims

---

[24] As discussed *supra* note 3, Plaintiff has withdrawn his claims against Hoehmann.

against her would be subject to dismissal under 12(b)(6)" for lack of personal involvement.  (*Id.* at 21–22.)  The Rockland Defendants argue that "Plaintiff does not allege that any of the Rockland Defendants were personally involved (or involved in any respect) in [OPD's] arrest of Plaintiff for two counts of harassment on April 28, 2020," nor does Plaintiff "allege that DA Walsh directed any Orangetown Police officer to take custody of Plaintiff that day."  (Rockland Mem. 2.)  In addition, the Rockland Defendants argue that "Plaintiff has failed to allege any personal involvement in the events of August 31, 2020 by DA Walsh, Sheriff Falco, Cpt. DeColyse, Dep. Leonard[,] or Det. Scanlon (or any John Doe Employees of the RCDAO), because they were not involved in the events of that day, and thus Plaintiff's claims which arise from his seizure pursuant to the Mental Hygiene Law on that date should be dismissed as against them."  (*Id.* at 10.)  Finally, the Rockland Defendants argue that Plaintiff failed to sufficiently plead the involvement of Defendants Falco, Walsh, and Neuendorf in the events of August 24, 2021.  (*See id.* 17–18.)  The Court will address each argument in turn.

### a.  Clarkstown Defendants: Cummings, Wannamaker, and McCullagh

The entirety of Plaintiff's claims against Cummings, Wannamaker, and McCullagh are found in two paragraphs of Plaintiff's original complaint, alleging, inter alia, that the three Defendants were involved in an alleged sham investigation of Plaintiff's request for an investigation into Plaintiff's seizure under New York's Mental Hygiene law on August 31, 2020. (*See* Compl. 15.)  Specifically, Plaintiff alleges that: (1) he "filed criminal charges on [October 15, 2020] and the Clarkstown Police never investigated[,]" asserting that "Cummings sent [Plaintiff] some letter which fiends an investigation but is really just an attempt to cover for" the officers involved; and (2) Plaintiff "tried calling [] Wannamaker and [] McC[u]llagh but they

refused to take [his] call[.]"  (*Id.*)[25]  Defendants argue that "[t]he alleged failure to adequately

respond to Plaintiff's purported complaint and refusal to answer his calls does not state a claim

because it does not allege involvement in the underlying constitutional violation."  (Clarkstown

Mem. 20.)  The Court agrees.

Plaintiff does not allege that any of these high-ranking police officials actively partook in

the alleged constitutional violations, but instead "had some at most tangential connection with

the events giving rise to [Plaintiff's] claims, [which] does not support a finding that they were

personally involved in the alleged violations of [Plaintiff's] constitutional rights."  *Reynolds v.

Barrett*, 741 F. Supp. 2d 416, 442 (W.D.N.Y. 2010), *aff'd*, 685 F.3d 193 (2d Cir. 2012)

(dismissing § 1983 claims against defendants named in a complaint where the allegations levied

against those defendants were "tangential" to the thrust of the constitutional violation alleged).

This alone merits dismissal of Plaintiff's claims against Cummings, Wannamaker, and

McCullagh.  *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013)

("It is well settled in this Circuit that personal involvement of defendants in the alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983." (quotation

marks omitted)).  Moreover, where a defendant's "only involvement . . . is the receipt of several

letters . . . and a failure to respond," "the receipt of [those] letters and lack of response [do] not

demonstrate personal involvement by [that defendant] in the alleged constitutional deprivations."

---

[25] In his Opposition, Plaintiff reiterates only conclusory allegations about each Defendant at issue.  As to Cummings, Plaintiff asserts that "Cummings was pressed for an investigation and he denied any investigation into a sworn criminal complaint[.]"  (Pl's Clarkstown Opp. 26.)  As to Wannamaker, Plaintiff claims that "RCDAO made it abundantly clear to (now) Chief Wannamaker that there was an ongoing civil dispute" and that this awareness somehow made Wannamaker involved in the constitutional deprivation.  (*Id.* at 7; *see also id.* at 6, 26.)  Plaintiff offers no additional allegations regarding McCullagh, other than stating in a heading that Plaintiff's claims against "McCallugh [sic] . . . have been clearly stated above."  (*See generally id.* at 26.)

*Middleton v. City of N.Y.*, No. 04-CV-1304, 2006 WL 1720400, at *13 (E.D.N.Y. June 19, 2006) (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1986)); *see also Wood v. Town of East Hampton*, No. 08-CV-4197, 2010 WL 3924847, at *21–22 (E.D.N.Y. Sept. 30, 2010) (same).

To the extent that Plaintiff alleges their involvement in their capacity as supervisors, Plaintiff's allegations still fall short.  In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit "held that 'there is no special rule for supervisory liability[,]' thereby doing away with 'the special standards for supervisory liability' . . . and clarifying that 'a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *32 (S.D.N.Y. Mar. 26, 2021) (quotation marks omitted) (quoting *Tangreti*, 983 F.3d at 617, 618).  Therefore, even with respect to supervisors, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

The Court is unaware of any case since *Tangreti* where a plaintiff was found to have plausibly alleged involvement by supervisor police officials unresponsive to a citizen's complaint, nor have the Parties pointed to such precedent.  However, in analogous situations—namely inmates accusing supervisor corrections officials of constitutional violations occurring in a correctional facility—courts in the Second Circuit have held both pre- and post-*Tangreti* that "receipt by a supervisory official of a letter [or a complaint] . . . , without more, has been insufficient to establish [an] official's personal involvement in a § 1983 constitutional claim."  *Braxton v. Bruen*, No. 17-CV-1346, 2021 WL 4950257, at *6 (N.D.N.Y. Oct. 25, 2021); *see also Loving v. Morton*, No. 20-CV-11135, 2022 WL 2971989, at *5–6 (S.D.N.Y. July 27, 2022) (collecting cases); *Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan.

26, 2021) ("That [the defendant] failed to act on [the] [p]laintiff's [or others' analogous] complaints . . . cannot support the inference that [he], through '[his] own individual actions, [has] violated the Constitution.'" (quoting *Tangreti*, 983 F.3d at 615)); *Houston v. Schiriro*, No. 11-CV-7374, 2014 WL 6694468, at *15 (S.D.N.Y. Nov. 26, 2014) ("[R]eceipt of a grievance does not constitute personal involvement."); *Walker v. Pataro*, No. 99-CV-4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official . . . receives . . . similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable.  On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable . . . . Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability." (italics omitted)). And, prior to *Tangretti*, where a plaintiff failed to allege a police supervisor was aware of, let alone participated in, constitutional violations, such claims against the supervisor were dismissed.  *See, e.g.*, *Gantt v. Ferrara*, No. 15-CV-7661, 2018 WL 4636991, at *7 (S.D.N.Y. Sept. 27, 2018) (dismissing a claim against a police chief for lack of involvement where "[the] [p]laintiff provides no detail of . . . other complaints [of similar misconduct], such as when they were filed and whether the alleged misconduct was similar, nor does he suggest that [the defendant] himself actually had information about these lawsuits").  "The Court sees no reason to lower pleading standards when *Tangreti* has done just the opposite." *Barkai v. Mendez*, —F. Supp. 3d—, 2022 WL 4357923, at *10 (S.D.N.Y. Sept. 20, 2022).

Thus, the Clarkstown Defendants' Motion with respect to Cummings, Wannamaker, and McCullagh is granted, and all claims related to all incidents at issue in the instant Action against these defendants are dismissed.

### b. Clarkstown Defendants: Dispatcher Monihan

The Clarkstown Defendants also argue that, "if Dispatcher Monihan had been properly served in this matter, the claims against her would be subject to dismissal under Rule 12(b)(6)" for failure to allege personal involvement. (Clarkstown Mem. 21–22.)[26] In Opposition, Plaintiff states that he "has clearly stated . . . the violations in procedure that led to [the] [d]ue [p]rocess claim against Dispatcher Monihan and will not argue them again." (Pl's Clarkstown Opp. 26.) As an initial matter, Dispatcher Monihan is only alleged to have been involved in the August 2020 seizure, where she is alleged to have dispatched CPD to Plaintiff's home after speaking to Detective Neuendorf. *See supra* Section I.A.2. As such, to the extent that Plaintiff intended to assert claims against Monihan related to the other two incidents at issue, those claims are dismissed.

As to the August 2020 seizure, Plaintiff alleges that "Monihan failed to follow procedures and further sent out a call about [Plaintiff] making 'suicidal threats' when in fact no such claim was even made." (Compl. 11.) Regarding the call placed by Neuendorf to CPD, Plaintiff alleges that Neuendorf told Monihan that Plaintiff had "made suicidal threats to the DA" on the call with the receptionist, that Plaintiff "sounded depressed and was being suicidal," and requested that CPD conduct a welfare check on Plaintiff. (*Id*. at 13–14; *see also* Culianos Rpt. (stating that Culianos was "informed by CPD Dispatch" that RCDAO "contacted CPD requesting a welfare check" after "an employee from the DA's office stated that [Plaintiff] had contacted the DA's

---

[26] The Court notes that Monihan has not waived service or any other defenses available based on lack of personal jurisdiction or improper service.

office stating that he was 'depressed and being suicidal'").)  Thereafter, Monihan dispatched

CPD officers to respond to Plaintiff's home for a welfare check.  (Compl. 14.)

Plaintiff alleges that "Dispatcher Monihan acted recklessly and illegally and essentially

put [Plaintiff's] life in danger when she dispatched armed men and women . . . to [his] home

telling those men and women on a dispatch call that [he] made 'suicidal threats to the DA' when

in fact the caller himself never alleged that when pressed by Monihan who asked 'what exactly

did he say.'"  (*Id.* at 14.)  Plaintiff alleges that Monihan had an unspoken higher duty to

independently investigate the claims concerning Plaintiff's mental health by speaking with the

receptionist who first took Plaintiff's call, rather than relaying the information provided to her as

a dispatcher in the face of alleged imminent danger.  (*See id.* at 14 ("Monihan should have

spoken to the person I spoke to first before dispatching a car to my house according to a call I

had with a Clarkstown Police Officer that was recorded.  She violated procedure.").)  However,

Plaintiff does not plausibly allege *any procedure* that would impose such a duty upon a

dispatcher, and the Court is skeptical of this assertion.

Under Plaintiff's interpretation, to avoid personal involvement in a potential § 1983

claim, a dispatcher must conduct his or her own investigation *before* dispatching assistance.  As

a policy matter, imposing § 1983 liability on a dispatcher in such a situation is untenable, as it

would prevent dispatchers from performing their vital role of timely dispatching officers to

provide assistance to those in need.  *See Venuti v. City of Elizabeth*, No. 03-CV-700, 2006 WL

2850606, at *7 (D.N.J. Oct. 3, 2006) ("The policy to dispatch officers to investigate calls for

assistance of citizens in the city they are sworn to protect and serve is a general if not universal

one.  It is not a policy that is designed to inflict injury in and of itself.").  Thus, it is no surprise

that lower courts in the Second Circuit have held that where a dispatcher only passes information

to law enforcement officers, a Plaintiff has not established personal involvement.  *See, e.g., Sentementes v. Town of Bethel*, No. 20-CV-580, 2020 WL 5994950, at *8 (D. Conn. Oct. 9, 2020) ("As [the] [d]ispatcher . . . is only alleged to have passed [a person's] call through to the . . . police department, [the plaintiff] has not established her personal involvement in any violation of [the plaintiff's] federal or constitutional rights."); *Bratton v. N.Y.S. Div. of Parole*, No. 05-CV-950, 2008 WL 1766744, at *15 (N.D.N.Y. Apr. 14, 2008) (finding that there was "no evidence of personal involvement or any other basis for liability" where a police chief had "no personal involvement with [the] plaintiff, except to relay [an individual's] request for assistance, dispatch vehicles in response to the request, and check the scene to insure that order had been restored").

The Court agrees with these decisions.  Accordingly, all claims against Monihan are dismissed for lack of personal involvement.

### c.  Clarkstown Defendants: Culianos

While not briefed by the Parties, (*see generally* Clarkstown Mem.; Pl's Clarkstown Opp.), the Court notes that Plaintiff has not alleged that Culianos is personally involved in the August 2020 seizure or August 2021 arrest, (*see generally* Compl.; FAC; SAC).  Accordingly, to the extent that Plaintiff intends to bring claims against Culianos for these incidents, the Court dismisses all claims related the August 2020 seizure and the August 2021 arrest against Culianos.

### d.  Rockland Defendants: Harassment Charges

The Rockland Defendants argue that, for all three incidents at issue in the instant Action, a combination of the Rockland Defendants were not personally involved in Plaintiff's allegations.  (*See generally* Rockland Mem.)  The Court will address personal involvement related to each incident for ease of analysis.

First, as it relates to the harassment charges in 2020, the Rockland Defendants argue that "Plaintiff does not allege that any of the Rockland Defendants were personally involved (or involved in any respect) in [OPD's] arrest of Plaintiff for two counts of harassment on April 28, 2020," nor does Plaintiff "allege that DA Walsh directed any Orangetown Police officer to take custody of Plaintiff that day." (Rockland Mem. 2.)[27]

At first glance, Plaintiff appears to agree with the individual Rockland Defendants in his Opposition, acknowledging that he has "never alleged that the individual Rockland Defendants were personally involved in Plaintiff's arrest on April 28, 2020." (*See* Pl's Rockland Opp. 6–7.)[28]  However, it is not clear whether Plaintiff is making a reference to the fact that he was not arrested on April 28, 2020, or that he agrees that the Rockland Defendants were not personally involved at all in his eventual arrest.  Regardless, Plaintiff's allegations related to the harassment charges can be split into two separate instances: (1) the allegations leading up to the harassment charges being filed, and (2) the eventual and short-lived prosecution of Plaintiff for the harassment charges.  As to the first, it is clear that Plaintiff does not allege that the Rockland Defendants were involved.  Plaintiff states that he was contacted by Detective Ryan at OPD, (*see* FAC 22), and OPD "advanced fraudulent harassment charges" against him by not reviewing the

---

[27] Plaintiff's chief rebuttal to the Rockland Defendants is that he "never alleged that he was arrested by [OPD] on April 28, 2020 in the first place" and the Rockland Defendants' "negligence and their inability to adhere to tangible facts of this case . . . prove[s] what Plaintiff has been arguing all along[.]"  (Pl's Rockland Opp. 6–7.)  However, as the Rockland Defendants point out, (*see* Rockland Reply 1n.1), the record before the Court is unclear as to when Plaintiff's arrest related to this incident occurred.  Moreover, the Rockland Defendants' apparent mistaken belief that the incident occurred on April 28, 2020 does not, on its own, lend the Court to find that the Rockland Defendants are personally involved in the alleged constitutional deprivation as required for § 1983 claims.

[28] When referring to the "individual Rockland Defendants," the Court is specifically excluding claims against the County of Rockland and RCSD, which will be discussed under separate analysis *infra* section II.B.5.

emails underlying the harassment complaints, (*see id*. at 7, 22).  At no time has Plaintiff alleged that any member of the RCDAO was personally involved in Plaintiff being charged with harassment.

Instead, Plaintiff characterizes the individual Rockland Defendants' involvement as what they *did not do*, namely that the RCDAO should have ensured that OPD did "a simple investigation by reading the emails and getting [Plaintiff's] side of the story as they are lawfully obligated to do" and, had RCDAO done this, charges would not have been brought.  (*Id*. at 9.) With the exception of Walsh, Plaintiff does not name any individual member of the RCDAO as being involved in the investigation of the harassment charges.  (*See generally* Compl.; SAC.) Indeed, the RCDAO's "tangential connection with the events giving rise to [Plaintiff's] claims . . . . does not support a finding that [its personnel] were personally involved in the alleged violations of [Plaintiff's] constitutional rights."  *Reynolds*, 741 F. Supp. 2d at 442.  Moreover, Plaintiff's "group pleading . . . . fail[s] to differentiate as to which defendant was involved in the alleged unlawful conduct[,]" and is thus "insufficient to state a claim."  *Adamou v. Cnty. of Spotsylvania*, No. 12-CV-7789, 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (citing *Autuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2d Cir. 2001) (summary order) (explaining that a complaint cannot "lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.")); *see also SCE Group Inc. v. City of N.Y.*, No. 18-CV-8909, 2020 WL 1033592, at *3 (S.D.N.Y. March 3, 2020) (dismissing the claims against individual defendants for lack of personal involvement because the plaintiff "set[] forth a panoply of law enforcement actions that it claimed were biased" but none of the allegations "refer specifically to any [i]ndividual [d]efendant" as required by Rule 8); *Johnson v. City of N.Y.*, No. 15-CV-8195, 2017 WL 2312924, at *10 (S.D.N.Y. May 26, 2017) (noting that "impermissible group pleading

. . . fails to specify which defendant or defendants were involved"). The Court finds the same as to the RCDAO John Does. "Although [Plaintiff] names them as [P]arties, [he] does not allege any facts regarding [the RCDAO John Doe] Defendants in [his] complaint." *Bernheim v. N.Y.C. Dep't of Educ.*, No. 19-CV-9723, 2020 WL 3865119, at *5 (S.D.N.Y. July 9, 2020), *report and recommendation adopted*, 2020 WL 4383503 (S.D.N.Y. July 31, 2020). Plaintiff also does not mention any RCDAO John Does in his motion papers.

Plaintiff also does not allege Walsh's personal involvement in his prosecution. For example, Plaintiff does not allege that Walsh himself filed any papers, appeared at any court proceedings, or did anything else that could plausibly establish that he was involved in bringing the harassment charges against Plaintiff. (*See generally* Compl.; SAC.) Liberally construing his allegations, Plaintifff alleges *supervisory* liability as to Walsh, claiming that Walsh had an obligation to "drop the charges" against him, and that by not doing so, Walsh violated "the rules of the Court of the State of [New York] 3.8(a) Special Rules for Prosecutors regarding probable cause." (SAC 8–9.) Plaintiff also alleges that Walsh "violated his oath by showing favor and affection to [MNH] and failed to treat [Plaintiff] and [his] family fairly and with dignity." (*Id*. at 9 (quotation marks omitted).) However, and as noted above, "there is no special rule for supervisory liability" and "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Falls*, 2021 WL 1164185, at *32 (quotation marks and citation omitted).

Because Plaintiff has failed to allege any personal involvement of the individual Rockland Defendants related to the harassment charges, the Court dismisses all claims related to the harassment charges as to the following individual defendants: Neuendorf, Walsh, Falco, DeColyse, Leonard, Scanlon, and the RCDAO John Does.

<u>e.  Rockland Defendants: August 2020 Seizure</u>

In addition, the Rockland Defendants argue that "Plaintiff has failed to allege any personal involvement in the events of August 31, 2020 by DA Walsh, Sheriff Falco, Cpt. DeColyse, Dep. Leonard[,] or Det. Scanlon (or any John Doe Employees of the RCDAO), because they were not involved in the events of that day, and thus Plaintiff's claims which arise from his seizure pursuant to the Mental Hygiene Law on that date should be dismissed as against them." (Rockland Mem. 10.)  First, while not mentioned in the Rockland Defendants briefing, the Court will note that Plaintiff has sufficiently alleged that Neuendorf was personally involved in the August 2020 seizure by virtue of his phone call with Plaintiff a week prior to the seizure, as well as Plaintiff's specific allegations that Neuendorf spoke with the dispatcher who eventually dispatched police to Plaintiff's home.  *See supra* Section I.A.2.  Similarly, Plaintiff has sufficiently alleged in his motion papers the involvement of the RCDAO John Does, who Plaintiff alleges Neuendorf "clearly spoke with" and who allegedly discussed with Neuendorf "a way to essentially shut Plaintiff up once and for all and teach him a lesson."  (Pl's Rockland Opp. 23 (quotation marks omitted).)  *See also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion.").

However, Plaintiff fails in his pleadings to allege any personal involvement by Falco, DeColyse, Leonard, Scanlon, or Walsh relating to the August 2020 seizure.  Instead, Plaintiff relies on group pleading to conclusorily insist that the "RCDAO conspired to abuse the legal process."  (Pl's Rockland Opp. 23.)  And, as to Walsh, Plaintiff alleges in a wholly conclusory manner that Neuendorf "possibly [spoke] with . . . Walsh himself."  (*Id.*)  "Even in the pro se context, the Court is not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'"  *Cadet v. All. Nursing Staffing of N.Y., Inc.*, —F. Supp.

3d—, 2022 WL 4584246, at *8 (S.D.N.Y. Sept. 29, 2022) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).  Because Plaintiff has failed to allege the personal involvement Walsh, Falco, DeColyse, Leonard, and Scanlon, the Court dismisses all claims related to the August 2020 seizure.

### f.  Rockland Defendants: August 2021 Arrest

Finally, the Rockland Defendants argue that Plaintiff has failed to sufficiently plead the involvement of Defendants Falco, Walsh, and Neuendorf in the events of August 24, 2021. (Rockland Mem. 17–18.)  In response, Plaintiff states that he "cannot plead the personal involvement of certain Rockland Defendants for the simple reason that at the time of the events in question Plaintiff was not in RCDAO offices or RCSD [headquarters]," and cannot identify the individuals involved in his August 2021 arrest.  (Pl's Rockland Opp. 26–28.)  The Court will address each individual in turn.

The Rockland Defendants argue that "any and all § 1983 claims against Sheriff Falco should be dismissed for Plaintiff's failure to plead Sheriff Falco's personal involvement in the arrest of Plaintiff on August 24, 2021 or during the subsequent prosecution of charges filed against Plaintiff for allegedly making a terroristic threat to the RCDAO and obstruction of governmental administration," because "the only allegation with respect to Sheriff Falco is that he provided information to the press after Plaintiff was arrested."  (Rockland Mem. 17.) Plaintiff argues that Falco "personally took credit for the unlawful arrest by knowingly defaming Plaintiff in the press."  (Pl's Rockland Opp. 26–27.)  However, at no point does Plaintiff allege what Falco personally did *before* Plaintiff's arrest in August 2021, instead relying on statements made some time *after* the arrest that Plaintiff "allegedly threatened to 'bomb the DA.'"  (FAC 11.)  And, "[i]n a false arrest context, [as in all constitutional violations pursuant to § 1983,] each individual must have been personally involved in the arrest in order to be held liable."  *Turner v.*

*Procopio*, No. 13-CV-693, 2020 WL 2220244, at *9 (W.D.N.Y. Mar. 27, 2020) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)), *abrogated on other grounds by Tangreti*, 983 F.3d 609).

As to Walsh, the Rockland Defendants argue that "Plaintiff conclusorily alleges that 'Walsh may deny his involvement in the events of August 31st, 2020, but he is directly implicated in the emails of August 24th, 2021 so he cannot claim he was no[t] involved.'" (Rockland Mem. 17; *see also* FAC 14.)  In addition, the Rockland Defendants argue that "[i]n making that bare allegation, Plaintiff provides no indication of what emails he is referring to, whether or not DA Walsh was a sender or recipient of any such emails, whether DA Walsh made any statements in any of those emails, and, if so, what DA Walsh said in those emails which would create an inference of his personal involvement in Plaintiff's arrest."  (Rockland Mem. 17.)  However, Plaintiff is correct that there is a clear inference to be drawn from the SAC and the documents provided by Plaintiff—Walsh was alerted to Plaintiff's alleged threat on August 24, 2021 in a forwarded email from another member of the RCDAO.  (*See* Pl's Rockland Opp. 26 ("[I]t is patently clear that CPD's initial alert[] to RCDAO was sent to . . . Walsh directly . . . ."); Ramirez Email 1 (showing an email at 12:34:21 PM from Peter Walker to Walsh and others).)  However, Plaintiff is not entitled to discovery or any further proceedings as related to Walsh and the August 2021 incident, as he claims, (*see* Pl's Rockland Opp. 27), because Plaintiff again fails to allege sufficient personal involvement by Walsh as related to the August 2021 incident.  Plaintiff's allegation that Walsh was copied on an email is not enough to establish Walsh's personal involvement in a constitutional violation.  *See Collins v. City Univ. of N.Y.*, No. 21-CV-9544, 2023 WL 1818547, at *7 (S.D.N.Y. Feb. 8, 2023) ("Participation in an email chain, without more, is insufficient to satisfy personal involvement."); *Cent. UTA of Monsey v. Vill. of*

*Airmont*, No. 18-CV-11103, 2020 WL 377706, at *23 (S.D.N.Y. Jan. 23, 2020) ("Plaintiffs fail to allege the personal involvement of [the defendant]—the only allegation against [the defendant] is that she was copied on an email."); *Frankel v. N.Y. State of Children & Family Servs.*, No. 11-CV-7973, 2013 WL 10349678, at *11 (S.D.N.Y. Apr. 20, 2013) (holding that a supervisor who was merely copied on an email was not personal involved in an alleged constitutional deprivation), *report and recommendation adopted as modified sub nom. Frankel v. N.Y. Off. of Children & Family Servs.*, 2015 WL 1290973 (S.D.N.Y. Mar. 23, 2015). Moreover, Plaintiff's conclusory allegation that Walsh is "'[t]he Judge' and clearly he orchestrated all of this" cannot sustain Plaintiff's claims. (FAC 13–14.) *See also Cadet*, 2022 WL 4584246, at *8 ("Even in the pro se context, the Court is not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" (citation omitted)).

Finally, the Rockland Defendants argue that Plaintiff does not "plead any facts suggesting that Det. Neuendorf was involved in his August 24, 2021 arrest (which he was not involved in), and thus, any attempt to assert claims against Det. Neuendorf arising from that arrest should be dismissed for lack of personal involvement." (Rockland Mem. 18 n.13.) Plaintiff does not reply to this argument directly, outside of group pleading that "no member of RCDAO . . . can be afforded any form of immunity at this time of the proceedings until they are fully deposed under oath and full discovery." (Pl's Rockland Opp. 27.) As reiterated above, group pleading without more is insufficient to withstand a challenge to a plaintiff's allegations of a defendant's personal involvement. *See Adamou*, 2016 WL 1064608, at *11.

Because Plaintiff has failed to sufficiently allege personal involvement of several of the Rockland Defendants, the Court finds the following: (1) claims related to Plaintiff's harassment charges are dismissed as to Defendants Neuendorf, Walsh, Falco, DeColyse, Leonard, Scanlon,

and RCDAO John Does; (2) claims related to Plaintiff's August 2020 seizure are dismissed as to Defendants Walsh, Falco, DeColyse, Leonard, and Scanlon; and (3) claims related to Plaintiff's August 2021 arrest are dismissed as to Defendants Falco, Walsh, and Neuendorf.

### 2. Remaining First and Fourth Amendment Claims

After this Court's personal involvement analysis, the following claims remain against the following individual Defendants:  (1) claims pertaining to Plaintiff's August 2020 seizure pursuant to the New York Mental Hygiene Law against Culianos, Neuendorf, and RCDAO John Does and (2) claims pertaining to Plaintiff's August 2021 arrest against DeColyse, Leonard, Scanlon, and RCDAO John Does.  Plaintiff alleges overlapping claims sounding in the First and Fourth Amendments related to both incidents, including allegations of unlawful arrest, malicious prosecution, and First Amendment retaliation.  (*See generally* Compl.; FAC; SAC.)  As such, the Court will analyze Plaintiff's First and Fourth Amendment claims as related to each incident.

### a. Applicable Law: First Amendment

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a *causal connection* between this adverse action and the protected speech.'"  *Matthews v. City of N.Y.*, 779 F.3d 167, 172 (2d Cir. 2015) (emphasis added) (quoting *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).

With respect to the first *Cox* factor, as the Supreme Court has said, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  *City of Hous. v. Hill*, 482 U.S. 451, 461 (1987).  Thus, an individual's "right to criticize the police without reprisal clearly satisfies the first prong of this test."  *Kerman v. City of N.Y.*, 261 F.3d 229, 242 (2d Cir. 2001).  To that end, the Second Circuit has held that speech directed at police officers is protected unless it is "likely to produce a clear and present danger of a serious

substantive evil that rises far above public inconvenience, annoyance or unrest." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (quotation marks and citations omitted).

With respect to the third and final *Cox* factor, causality, the retaliatory motive must be a "but-for" cause. *Hartman v. Moore*, 547 U.S. 250, 260 (2006). In other words, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, ⸺ U.S. ⸺, 139 S. Ct. 1715, 1722 (2019) (emphasis in original). For this reason, where a plaintiff asserts a claim of First Amendment retaliation, the complaint "must plead and prove the absence of probable cause for the arrest," as probable cause vitiates the causal element entirely. *Id.* at 1724.

### b. Applicable Law: Fourth Amendment

#### i. False Arrest

Plaintiff asserts "unlawful arrest" claims, (*see* Compl. 3), which this Court construes as a claim for false arrest. *See Bell v. Drakeford*, No. 18-CV-2225, 2020 WL 1819879, at *2 (S.D.N.Y. Apr. 10, 2020). "In analyzing § 1983 claims for unconstitutional false arrest and imprisonment, federal courts look to the law of the state in which the arrest occurred—not federal law." *5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 192 (S.D.N.Y. 2010) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (applying New York false arrest law to adjudicate a false arrest claim brought pursuant to § 1983). Under New York law, a plaintiff alleging false arrest must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration, quotation marks, and citation omitted). "A confinement is privileged if probable cause existed at the time

of the arrest.  Thus, a claim for false arrest must fail if probable cause to arrest existed."

*Martinetti v. Town of New Hartford Police Dep't*, 112 F. Supp. 2d 251, 252 (N.D.N.Y. 2000)

(citations omitted), *aff'd sub nom. Martinetti v. Town of New Hartford*, 12 F. App'x 29 (2d Cir.

2001) (summary order); *see also Weyant*, 101 F.3d at 852 ("The existence of probable cause to

arrest constitutes justification and 'is a complete defense to an action for false arrest[.]'" (quoting

*Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994))); *Gerasimou v. Cillis*, No. 15-CV-

6892, 2022 WL 118748, at *3 (E.D.N.Y. Jan. 12, 2022) ("The existence of probable cause

precludes a finding for the plaintiff on [the fourth] element; it is therefore a 'complete defense' to

a false-arrest claim." (citing *Covington v. City of N.Y.*, 171 F.3d 117, 122 (2d Cir. 1999)));

*Frigerio v. United States*, No. 10-CV-9086, 2011 WL 3163330, at *8 (S.D.N.Y. July 22, 2011)

("[T]he existence of probable cause is an absolute defense to a false arrest claim." (quoting

*Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006))); *Decker v. Campus*, 981 F. Supp. 851, 856

(S.D.N.Y. 1997) ("If there existed probable cause at the time of the arrest, the arrest is

'privileged,' and the individual has no constitutional or statutory claim against the officer who

made the arrest.").

"The question of whether or not probable cause existed may be determinable as a matter

of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may

require a trial if the facts are in dispute."  *Weyant*, 101 F.3d at 852 (citations omitted)).  In

contrast, "[w]here the question of whether an arresting officer had probable cause is

predominantly factual in nature, as where there is a dispute as to the pertinent events, the

existence *vel non* of probable cause is to be decided by the jury."  *Murphy v. Lynn*, 118 F.3d 938,

947 (2d Cir. 1997).

In the criminal context, "[p]robable cause exists when, based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). "Probable cause is to be assessed on an objective basis." *Zellner*, 494 F.3d at 369.  In practice, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

As this standard makes clear on its face, "probable cause is 'a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  To that end, though probable cause demands more than "mere suspicion" of criminal wrongdoing, *Mallory v. United States*, 354 U.S. 449, 454 (1957), the concept should be centered on "probabilities" rather than "hard certainties," *Gates*, 462 U.S. at 231.  Thus, according to the Supreme Court, when courts review a situation frozen in ink and perform ex post facto probable cause analyses with the benefit of near-unlimited time, they are to think about "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (same).

Finally, probable cause can exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard*, 25 F.3d at 102.  Once a government official has a reasonable basis to believe that there

is probable cause to arrest, the official "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Garcia v. Does*, 779 F.3d 84, 93 (2d Cir. 2015) (quotation marks and citation omitted).  "In sum, probable cause does not demand any showing that a good-faith belief be 'correct or [even] more likely true than false.'  It requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Walczyk*, 496 F.3d at 157 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

### ii.  Malicious Prosecution

Similarly, "[t]o state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Rodriguez v. City of N.Y.*, —F.Supp.3d—, 2022 WL 3587598, at *5 (S.D.N.Y. Aug. 22, 2022) (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 179 (2d Cir. 2022)).  To state a claim for malicious prosecution under New York law a plaintiff must show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quotation marks and citation omitted).  In addition, to prevail on a cause of action for malicious prosecution under § 1983, the plaintiff must establish that "there was [] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL 2819459, at *10 (S.D.N.Y. July 19, 2022) ("In addition to the elements of a state-law malicious prosecution claim, however, to state a federal malicious prosecution claim under § 1983, a plaintiff must also have suffered a post-arraignment deprivation of liberty implicating his Fourth Amendment rights.").

Just as probable cause is a complete defense to a claim of false arrest, "continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161–62 (2d Cir. 2010) ("Probable cause is a complete defense to a claim of malicious prosecution[.]").  "Probable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 243 (2d Cir. 2020) (alteration, quotation marks, and citation omitted).  "The Second Circuit has clarified that probable cause for a malicious prosecution claim means probable cause to believe that [the prosecution] could succeed[.]" *Delanuez v. City of Yonkers*, No. 20-CV-4476, 2022 WL 16540682, at *8 (S.D.N.Y. Oct. 28, 2022) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)) (quotation marks omitted).  The Second Circuit has also cautioned courts not to "conflate probable cause to arrest with probable cause to believe that [a plaintiff] could be successfully prosecuted," because in a malicious prosecution action, "[o]nly the latter kind of probable cause is at issue." *Posr*, 180 F.3d at 417.  Therefore, in instances where evidence "would clearly not be admissible," "there would be no probable cause to believe that the prosecution could succeed." *Boyd*, 336 F.3d at 77.  "Courts applying this standard have largely held that . . . evidence obtained in violation of a plaintiff's Fourth Amendment rights cannot be relied on in arguing that there was probable cause to believe the plaintiff could be successfully prosecuted." *Vasquez v. Reilly*, No. 15-CV-9528, 2017 WL 946306, at *8 (S.D.N.Y. Mar. 9, 2017) (collecting cases) (ellipses added).  Thus, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013).

c.  Application: August 2020 Seizure

Plaintiff's Fourth Amendment claims related to the August 2020 seizure largely center around what Plaintiff alleges was a false statement: that Plaintiff was "depressed" or "suicidal" as relayed to Dispatcher Monihan by Neuendorf.  *See supra* § I.A.2.  "The [c]ourts that have addressed seizures under a state's mental hygiene or mental health laws have applied the concepts of 'probable cause' that have arisen in criminal Fourth Amendment seizure cases." *Bayne v. Provost*, No. 04-CV-44, 2005 WL 1871182, at *6 (N.D.N.Y. Aug. 4, 2005) (collecting cases from the Second Circuit, a district court therein, and other courts of appeal); *cf. Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) ("The Crisis Team took [plaintiff] to the hospital against his will, and he was involuntarily confined there pursuant to state law.  This infringement of his liberty was tantamount to the infringement of being arrested.  That his seizure occurred in the civil context does not render the Fourth Amendment inapplicable." (citations omitted)). Therefore, as it applies to this Action, if probable cause existed as to the conditions precedent for civil confinement in N.Y. Mental Hyg. Law ("NYMHL") § 9.41(a) ("§ 9.41"), an individual's confinement pursuant thereto "was privileged and his . . . claims fail as a matter of law," *Bayne*, 2005 WL 1871182, at *6.

Applying these same principles of probable cause to the civil confinement context, the Court's task is to determine, based on Plaintiff's allegations, if the officers in this Action— namely Neuendorf and Culianos—had probable cause to believe that Plaintiff might be "mentally ill and [] conducting himself . . . in a manner . . . likely to result in serious harm to [himself] or others."  NYMHL § 9.41(a).[29]  New York law defines a "likelihood to result in serious harm" as follows:

---

[29] The Court declines to analyze Officer Donnegan's actions as they relate to Plaintiff, as she has not been served in this Action.

(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* § 9.01.

Starting with Neuendorf, the Rockland Defendants argue that Neuendorf "cannot be held liable for requesting that the [CPD] report to Plaintiff's home to check on his welfare" because Plaintiff cannot show that Neuendorf is the proximate cause of Plaintiff's alleged § 1983 claim. (Rockland Mem. 10–12.)  Plaintiff vehemently disagrees, arguing that Neuendorf lied to CPD dispatch, setting off a chain of events that eventually led to Plaintiff's seizure.  (Pl's Rockland Opp. 16–20.)  The Court agrees with Neuendorf, however for a slightly different yet fundamental reason:  Neuendorf was not an "arresting officer" liable under a false arrest claim, nor did he have reason to know that a possible false arrest would occur.

In the criminal context, as applied to detention for a mental health evaluation under § 9.41(a), the crucial probable cause inquiry "is based upon whether the facts known *by the arresting officer at the time of arrest* objectively provided probable cause to arrest."  *Jaegly*, 439 F.3d at 156 (emphasis added).  When conducting this analysis in the context of a § 9.41(a) detention, "a police officer is justified in relying upon a citizen's warning that another person has threatened suicide even if it is later determined by mental health professionals that the person presents no such risk."  *Bayne*, 2005 WL 1871182, at *7.  There are no allegations that Neuendorf himself was present at Plaintiff's home to conduct the alleged false arrest.  However, "a police officer can only be liable for a false arrest that occurs outside of his presence if he 'had reason to know' that such a false arrest was likely to occur."  *Bianco v. Cnty. of Nassau*, No. 16-CV-444, 2018 WL 1175157, at *7 (E.D.N.Y. Mar. 6, 2018) (quoting *Escalera v. Lunn*, 361 F.3d 737, 748 n. 4 (2d Cir. 2004)).  Drawing all inferences in Plaintiff's favor, Neuendorf allegedly

made a knowingly false report that Plaintiff had "made suicidal threats to the DA" and that

Plaintiff "sounded depressed and was being suicidal."  (Compl. 13–14; *see also id*. at 10 ("[A]t

no time did I threaten [the receptionist] nor did I threaten myself or ideate suicide in any manner

what so ever [sic].").)  However, even as alleged by Plaintiff, Neuendorf did not have "reason to

know" that Plaintiff would be arrested, as Neuendorf did not ask the dispatcher to "arrest"

Plaintiff or even bring him to a hospital, aside from Plaintiff's conclusory allegations concerning

Neuendorf's apparent intent.  (*See, e.g.,* Compl. 13 ("N[eu]ndorf knowingly lied to the police to

harass me and have me deprived of my rights under color of law, a felony, either to teach me a

lesson or to fabricate evidence for pending civil litigation or both.").)  As per an exhibit offered

by Plaintiff himself, Neuendorf requested a "welfare check" for Plaintiff, not for Plaintiff to be

arrested.  (Culianos Rpt. (narrative from Culianos stating that he was "informed by CPD

Dispatch" that RCDAO "contacted CPD requesting a welfare check" after "an employee from

the DA's office stated that [Plaintiff] had contacted the DA's office stating that he was

'depressed and being suicidal'").)

        In the Second Circuit, in a false arrest claim based on a wrongful arrest for a mental

health evaluation, "police officers must consider whether probable cause exists to believe the

individual is a danger to herself or others, that is, whether there is a substantial risk of serious

physical harm to herself or others." *Guan v. City of N.Y.*, 37 F.4th 797, 807 (2d Cir. 2022).

Plaintiff has alleged no facts that give rise to the inference that Neuendorf "had reason to know"

that a false arrest would occur; instead, Neuendorf at most knew that officers would conduct a

welfare check to determine if Plaintiff was at risk of harming himself or others.  This differs

from other cases within the Second Circuit where a non-arresting officer's involvement could be

directly traced to the individual's later arrest. *See, e.g.*, *Bianco*, 2018 WL 1175157, at *7

(finding that a plaintiff adequately alleged involvement by a non-arresting officer when that

officer "took [] information from [a] security officer when drafting the criminal complaint");

*Gomez v. City of N.Y.*, No. 16-CV-1274, 2017 WL 1034690, at *7  (E.D.N.Y. Mar. 16, 2017)

(finding that an officer's "alleged involvement in the investigation and photo array that led to

Plaintiff's arrest are sufficient to establish false arrest liability under Section 1983.").  As such,

because Plaintiff has not alleged that Neuendorf had reason to know that Plaintiff would be

arrested by requesting a welfare check, Neuendorf cannot be held liable for false arrest.[30]

As to Culianos, the Clarkstown Defendants argue that "Plaintiff cannot establish the

fourth element of [a false arrest claim] because . . . the police had probable cause to detain

Plaintiff pursuant to the state Mental Hygiene law."  (Clarkstown Mem. 12.)  Plaintiff claims that

Culianos and his partner, Donnegan "ignore[d] clearly exculpatory evidence" upon arriving at

Plaintiff's home that he was not a substantial risk of harm to himself or to others.  (Pl's

Clarkstown Opp. 13–14.)  The Court agrees that Plaintiff has sufficiently alleged that Culianos

lacked probable cause at the time of arrest.

In reaching this conclusion, the Court has the benefit of several pieces of relevant

evidence provided by Plaintiff, including his own allegations throughout his Complaints as well

as a 55-minute audio recording of his seizure by Donnegan and Culianos.  Plaintiff's interactions

with Donnegan are almost all captured by the audio recordings, but Plaintiff's interactions with

Culianos are largely unintelligible.  (*See generally* Aug. 2020 Recording.)  However, Plaintiff

---

[30] Additionally, Plaintiff has not alleged any First Amendment retaliation claim against
Neuendorf or any RCDAO Defendant arising from this incident.  (*See generally* Compl.; FAC;
SAC.)  Specifically, Plaintiff has not alleged what protected speech he made, or that this
protected speech was "motivated" or "substantially caused" Neuendorf to take the actions he did
on that day.  Accordingly, to the extent that Plaintiff intended to raise a First Amendment
retaliation claim against Neuendorf or any other RCDAO Defendant, this claim is dismissed as
related to the 2020 seizure.

alleges that Culianos's alleged actions were in direct response to witnessing Plaintiff speak with Donnegan.  (Compl. 11.)  As such, the Court recounts both interactions as relevant to the question of probable cause.

Plaintiff alleges that both Donnegan and Culianos arrived at Plaintiff's home after receiving what Plaintiff alleges is false information, that Plaintiff was "depressed and was being suicidal."  (Compl. 13–14; *see also* Culianos Rpt. (narrative from Culianos stating that he was "informed by CPD Dispatch" that RCDAO "contacted CPD requesting a welfare check" after "an employee from the DA's office stated that [Plaintiff] had contacted the DA's office stating that he was 'depressed and being suicidal'").)  Approximately five minutes after Plaintiff joined a business call, Donnegan knocked on Plaintiff's front door and asked him a series of questions.  (Compl. 11.)  According to the audio recording provided to the Court, the following exchange between Plaintiff and Donnegan occurred:

> Donnegan: "How are you doing?"
> Plaintiff: "Good."
> Donnegan: "Who is that?"[31]
> Plaintiff: "Work."
> Donnegan: "Can I come in?"
> Plaintiff: "No, not now, not now, not now.  Please leave my property, leave my property."

(Aug 2020 Recording at 5:38–5:50.)  Plaintiff then closes the door and reopens it, stating: "This is a 130-million-dollar call, come back . . . come back in 30 minutes."  (*Id.* 5:52–6:02.)  Plaintiff then reopens the door and tells Donnegan "this is a 130-million-dollar call, you'll have to come back."  (*Id.* 6:16–6:21.)  Then, the following exchange occurs:

> Donnegan: "Ok, can I just ask you a few questions?"
> Plaintiff: "No, no, not now. No."
> Donnegan: "Just a few questions.  Just a few questions."

---

[31] The Court assumes that Donnegan is referencing the call on speakerphone when referring to "who."

> Plaintiff: "No, no.  This is a 130-million-dollar call, are you on drugs?  Get away from me."

(*Id*. 6:21–6:33.)  Finally, Plaintiff alleges that Donnegan refused to leave and "refus[ed] to tell [Plaintiff] why she was there."  (Compl. 11.)

After review of the audio, the Court agrees that the audio recording of Plaintiff's business call supports Plaintiff's allegations that he was not suicidal or posed a substantial risk of harm to others.  Indeed, throughout the conversation, Plaintiff appears to calmly explain to Donnegan that he is on an important business call and could not be interrupted at the time, offering to speak with her again in 30 minutes after the call ended.  (Aug 2020 Recording 5:52–6:02.)  Instead, it appears that Plaintiff became frustrated during the interaction, not due to any potentially suicidal behavior, but instead because Donnegan does not state why she is there, why Plaintiff must answer her questions at that exact time, or why Donnegan will not leave his property.  Plaintiff alleges that, upon arrival at his home, Donnegan should have "ascertained immediately" that Plaintiff was not suicidal as reported by the dispatcher and concluded Plaintiff did not pose "a substantial risk to [himself] or someone else."  (Compl. 13.)  Given the procedural posture of the case, the Court must credit Plaintiff's recitation of the facts, *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 613 (S.D.N.Y. 2009) ("When assessing qualified immunity at the motion to dismiss stage, before the benefits of discovery, the Court must take the plaintiff's well-pleaded facts as true."); additionally, "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence," *Kerman,* 261 F.3d at 241 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).  In this Action, the potential exculpatory evidence could include Donnegan's interaction with Plaintiff, which as alleged and as bolstered by the audio recording, appears to have been largely calm and free of evidence that Plaintiff was at risk of harming himself or others.  *Cf. Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (probable cause exists "[w]hen

information is received from a putative victim or an eyewitness . . . unless the circumstances *raise doubt* as to the person's veracity" (emphasis added)).

Of course, the inquiry before the Court is whether Culianos had probable cause to arrest Plaintiff pursuant to § 9.41. Plaintiff's interactions with Donnegan are crucial to understanding Plaintiff's allegations however, as Plaintiff alleges that Culianos *reacted* to Plaintiff's encounter with Donnegan. (Compl. 11.) Specifically, Plaintiff alleges that he mistook Culianos for a different CPD officer he was familiar with, asking Culianos to "tell this officer [Donnegan] that I am on that conference call for the deal I went to the Dominican Republic for. Its [sic] going on right now." (*Id*.) Plaintiff alleges that Culianos then said "[the mistaken CPD officer] is not your private . . . cop and I don't like the way you are speaking to my partner." (*Id*.) Plaintiff alleges that, because Culianos did not like the way he was speaking to Donnegan, Culianos "grabbed [Plaintiff] and assaulted [him] by slamming [him] against the wall of [his] home face first." (*Id*.) After this, Plaintiff alleges that Culianos placed him in the back of the patrol car, briefly entered Plaintiff's home looking for other occupants, and brought Plaintiff against his will to MNH. (*Id*. at 12.)

Culianos argues that "[w]hen officers arrived to conduct a welfare check, Plaintiff behaved erratically, repeatedly going in and out of his house, ranting about a multi-million dollar international phone call, and refusing to speak to the officers." (Clarkstown Mem. 16.) However, as outlined above, Plaintiff has plausibly alleged that he was not "behaving erratically" at all—he alleges that he was on an important business call (which at least Donnegan could hear in real-time on speaker phone) and asked officers to leave. (*See* Compl. 10–11.)

Defendants most closely analogize Plaintiff's arrest to *Bayne v. Provost*, No. 04-CV-44, 2005 WL 1871182 (N.D.N.Y. Aug. 4, 2005). In *Bayne*, a plaintiff's home health nurse spoke

with the plaintiff, who indicated that he "planned to commit suicide."  2005 WL 1871182 at *1.
The home health aide called 911, stating that she "was not sure whether [the plaintiff] actually
intended to commit suicide or if he was just being manipulative," but indicated that he had
"many pills in his residence that he could ingest in a fatal dose."  *Id*.  State troopers were
dispatched in response to this call and were informed that the plaintiff suffered from Parkinson's
Disease, had threatened suicide, and that "a possible method of suicide would be an overdose of
pills."  *Id*. at *2.  Once the troopers arrived at Plaintiff's apartment, the troopers "observed
multiple bottles of pills about the residence," and Plaintiff "admitted to [the troopers] that he
made a statement to [his home health aide] that he was going to commit suicide, but asserted to
the [t]roopers that he was not serious when he made the statement."  *Id*.  The court in *Bayne*
found at summary judgment that the troopers had sufficient probable cause to believe that the
Plaintiff presented a risk of suicide.  *Id*. at *8.  Importantly, the court analyzed not just the 911
call by the home health aide, but the corroborating factors that the troopers then found when
arriving at the plaintiff's home and the trooper's "on the spot judgment call" that Plaintiff was
*presently* at risk.  *Id*.

   As alleged by Plaintiff at this early stage of litigation, it is an open question whether
Culianos had sufficient probable cause to believe that Plaintiff was dangerous to himself and
others.  First, Donnegan and Culianos were merely instructed that Plaintiff was "depressed and
suicidal," and as alleged, neither Donnegan nor Culianos encountered any evidence to support
that claim, such as finding dangerous weapons or pills.  This is a far cry from the facts at issue in
*Bayne* or the other cases cited by the Clarkstown Defendants, which the Court notes were
decided at the summary judgment stage with the benefit of evidence not currently before the
Court.  *See Mittelman v. Cnty. of Rockland*, No. 07-CV-6382, 2013 WL 1248623, at *12–13

51

(S.D.N.Y. Mar. 26, 2013) (finding probable cause where a victim informed an officer directly that the plaintiff threatened to shoot him and the officers were informed that "the suspect possessed weapons, was in an unstable condition, had made prior threats" and the plaintiff failed to respond to the officers"); *Sanchez v. Town of Greece*, No. 98-CV-6433, 2004 WL 1964505, at *3 (W.D.N.Y. Sept. 1, 2004) (finding at summary judgment that, "although [the plaintiff] and the officers' versions of events . . . differ in some respects, there is no real dispute as to the material facts" where the plaintiff was initially unable to drive and largely unresponsive after being pulled over by officers, and then "drove his car only a short distance and abruptly pulled over again," which "gave the officers cause for continued concern").

Second, Defendants also argue that Culianos is entitled to qualified immunity because there was arguable probable cause to detain Plaintiff.  (*See* Clarkstown Mem. 18–19.)  However, the same factual dispute that thwarted Defendants' argument regarding probable cause defeats the claim of arguable probable cause.  "At this stage of the litigation, without the benefit of discovery and the facts to be gleaned therefrom, the Court declines to decide whether the Defendants are entitled to qualified immunity." *Doe v. Town of Greenwich*, 422 F. Supp. 3d 528, 538 n.2 (D. Conn. 2019); *see also Barkai*, 2022 WL 4357923, at *21 (denying a motion to dismiss on qualified immunity grounds because the same fact disputes also exist when assessing "arguable probable cause").  Accordingly, the Court denies the Clarkstown Defendants' Motion with respect to Plaintiff's Fourth Amendment claim against Culianos as it relates specifically to Culianos's actions seizing Plaintiff in August 2020.  *See Norman v. Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *12 (S.D.N.Y. July 31, 2020) ("Thus, the [c]ourt will not dismiss [the] [p]laintiff's claim against [one defendant] based on qualified immunity at this early stage, without the benefit of discovery."); *Doe*, 422 F. Supp. 3d at 538 n.2 ("At this stage of the

litigation, without the benefit of discovery and the facts to be gleaned therefrom, the Court declines to decide whether the Defendants are entitled to qualified immunity."); *cf. Bailey v. Pataki*, No. 08-CV-8563, 2010 WL 234995, at *2 (S.D.N.Y. Jan. 19, 2010) (denying motion to dismiss on qualified immunity grounds because the court "could not find that defendants were entitled to qualified immunity as a matter of law").

As to Plaintiff's First Amendment claim against Culianos, accepting Plaintiff's allegations as true and construing them broadly, Plaintiff can be deemed to allege that his confinement happened because Culianos did not "like the way [Plaintiff was] speaking to [Culianos's] partner." (Compl. 11.) The Clarkstown Defendants do not address this claim, instead arguing that Plaintiff does not allege "that the Clarkstown Defendants sought to retaliate against Plaintiff for the exercise of his rights," focusing on the charges filed by the RCDAO and whether the Clarkstown Defendants were indeed aware that Neuendorf's report of suicidal threats was false and that Plaintiff had made prior complaints about MNH. (Clarkstown Mem. 7–8.) However, Plaintiff alleges he made no suicidal threats, at any time, or even words that could have been interpreted as threats, including upon the officers' arrival. (*See* Compl. 11 ("Again, the whole incident is recorded and AT NO TIME did I threaten Donnegan or myself and AT NO TIME did I scream and yell. I merely asserted my rights as a homeowner . . . ." (emphasis in original)).) This necessarily encompasses all statements Plaintiff made once Culianos and Donnegan arrived at the scene, including once probable cause and arguable probable cause may have evaporated. And Plaintiff's statements with Donnegan requesting that she leave his premises, upon which Culianos based his actions, cannot be said to be beyond the protection of the First Amendment, thus satisfying the first prong of a First Amendment retaliation claim. *See City of Hous.*, 482 U.S. at 461 ("[T]he First Amendment protects a

53

significant amount of verbal criticism and challenge directed at police officers."); *Krzeminski v. City of Buffalo*, No. 17-CV-245, 2018 WL 10335659, at *5 (W.D.N.Y. Dec. 10, 2018) (applying *City of Houston* to an investigation where the plaintiff "was merely trying to explain to the police what had happened" at the time of arrest), *report and recommendation adopted*,  2019 WL 5956368 (W.D.N.Y. Nov. 13, 2019).

As it relates to a causal connection, construed broadly, Plaintiff sufficiently alleges a retaliatory motive: Plaintiff complained to Donnegan and Culianos about being on his property, and soon thereafter Culianos and Donnegan seized him.  *Cf. Moore v. Parsons*, No. 18-CV-507, 2018 WL 1882858, at *6 (D. Conn. Apr. 19, 2018) (denying a motion to dismiss a First Amendment retaliation claim where a defendant "allege[d] that upon voicing an intention to 'tell[ ] the lieutenants' and complain" about a prison official's conduct, he faced adverse actions).  That Plaintiff's seizure occurring during or immediately following Plaintiff's complaints further suggests retaliation.  *Anderson v. City of N.Y.*, 817 F. Supp. 2d 77, 97–98 (E.D.N.Y. 2011) (denying defendants' motion for summary judgment on First Amendment claims where a plaintiff "was arrested for telling the officers to arrest" a hospital security guard)[32]

The Clarkstown Defendants' other counterarguments do not overcome Plaintiff's allegations.  For example, probable cause is no longer an issue in pleading this causality, as Plaintiff has plausibly alleged that no probable cause existed.  Therefore, probable cause provides no shield from Plaintiff's First Amendment claim against Culianos.  Defendants' final

---

[32] The second prong of First Amendment retaliation is met because seizure is clearly an adverse action.  *See Hous. Cmty. Coll. Sys. v. Wilson*, — U.S. —, 142 S. Ct. 1253, 1260 (2022) ("Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment.").

refuge is the argument that Plaintiff failed to allege that his speech was effectively chilled, thereby nullifying his claim.  (*See* Clarkstown Reply 2.)  This argument fails for multiple reasons.

First, Second Circuit precedent previously suggested that, to sustain a First Amendment claim, it must be that the "defendants' actions effectively chilled the exercise of [a plaintiff's] First Amendment right."  *Curley*, 268 F.3d at 73 (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).  But after pronouncing the "chilling" standard set forth in *Signoracci*, the Second Circuit clarified that "[c]hilled speech is not the sine qua non of a First Amendment claim," and that "[a] plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation *or that he has suffered some other concrete harm*."  *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015) (emphasis added) (quoting *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)).

The Second Circuit expressly declined to determine whether "allegations of emotional and psychological harm would establish compensable injury in a First Amendment retaliation claim."  *Zherka v. Amicone*, 634 F.3d 642, 646–47 (2d Cir. 2011).  Other circuits, by contrast, "have 'recognize[d] that in some [First Amendment retaliation] cases 'injury based on embarrassment, humiliation, and emotional distress' is sufficient to be actionable under § 1983."  *Doe v. City of N.Y.*, No. 18-CV-670, 2018 WL 3824133, at *13 (E.D.N.Y. Aug. 9, 2018) (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (alterations in original)); *see also Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) ("In certain cases, a public official may also face liability where he retaliated by subjecting an individual to 'embarrassment, humiliation, and emotional distress.'") (citation omitted); *Naucke v. City of*

*Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) ("In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim.").

The Court agrees with Judge Ross's analysis in *Doe*:

> *Dorsett* implicitly characterizes the requirement that a plaintiff show "some injury" as stemming from the requirements for Article III standing.   Immediately after stating that "[c]hilled speech is not the *sine qua non* of a First Amendment claim," the court notes: "A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."   This is consistent with the Second Circuit's observation in *Zherka* that "[w]here chilling is not alleged, other forms of tangible harm will satisfy the injury requirement, since 'standing is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling.'"   Such language suggests that the Second Circuit now requires private citizens raising First Amendment claims to show only a concrete harm sufficient to constitute an "injury in fact" sufficient for standing.

2018 WL 3824133, at *13 (citations omitted).   As the Supreme Court recently reaffirmed, "[v]arious intangible harms," and particularly "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," can be sufficiently "concrete" so as to confer standing.   *TransUnion LLC v. Ramirez*, ––– U.S. ––––, 141 S. Ct. 2190, 2204 (2021).   "Emotional distress meets this test—it is the harm underlying the common-law tort of intentional infliction of emotional distress."   *Doe*, 2018 WL 3824133, at *14.

In this Action, Plaintiff has pled emotional distress.   Plaintiff details, at length, the forms of emotional distress he has experienced as a result, at least in part, of the conduct giving rise to the claims herein.   (*See* Compl. 15–16.)   For example, Plaintiff claims that he has "been in therapy," that his "feeling of safe and security in the community where [his] family has lived since 1974 has been shattered," and that he "no longer feel[s] safe."   (*Id*. at 15.)   Accordingly, the Clarkstown Defendants' argument falls far short.

Second, as other courts within the Second Circuit have held, simply being arrested "ha[s] an immediate and specific chilling effect on [a] plaintiff in that upon arrest he [is] unable to

continue his demonstration and his First Amendment activities [are] cut short." *Lederman v. Adams*, 45 F. Supp. 2d 259, 271 (S.D.N.Y. 1999); *see also Anderson*, 817 F. Supp. 2d at 97–98 (denying the defendants' motion for summary judgment because "[a] jury could find that [the] plaintiff's arrest and confinement were sufficient to constitute actual chilling of his First Amendment right to speak out against police officers"). Indeed, the Second Circuit addressed this idea—admittedly with slightly different facts—far more bluntly in *Kerman*: "[A]n involuntary [] trip to [a hospital] has an obvious chilling effect." 261 F.3d at 242. Therefore, Plaintiff sufficiently alleges a First Amendment claim against Culianos.

### d.  Application:  August 2021 Arrest

As to Plaintiff's August 2021 arrest, Plaintiff's false arrest and malicious prosecution fail, either because of lack of personal involvement or because the arresting officers had probable cause to arrest and prosecute Plaintiff.

First, as to DeColyse, Plaintiff has not alleged that he was involved in Plaintiff's arrest. (*See generally* Compl.; FAC; SAC.) Instead, Plaintiff alleges that he spoke initially to DeColyse after the alleged threat was passed along to RCSD. (FAC 10–11; DeColyse Call.) Nor does Plaintiff allege that DeColyse made any false statements throughout the events leading up to Plaintiff's arrest. Because DeColyse is not alleged to have been an arresting officer or to have provided any false information that led to his arrest, Plaintiff's false arrest claims against DeColyse are dismissed. *See Drayton v. City of N.Y.*, No. 17-CV-7091, 2020 WL 2615930, at *5 (E.D.N.Y. May 20, 2020) (dismissing false arrest claim against an officer who signed arrest documents but was not present when the plaintiff was arrested); *cf. Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *16 (S.D.N.Y. Mar. 7, 2016) (denying a motion to dismiss because the plaintiff alleged that the officers submitted "false statements" in the arrest paperwork).

57

However, as to Scanlon, Plaintiff alleges that he made a "knowingly false and illegal report to RCSD from RCDAO that Plaintiff was 'on his way to shoot the place up'" when this claim did not appear in Detective Ramirez's email.  (Pl's Rockland Opp. 27.)  As alleged, Scanlon could be held liable for false arrest for making false statements, which constitutes "direct participation . . . in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).  In addition, Plaintiff alleges that Leonard was the arresting officer in the August 2021 incident.  (Pl's Rockland Opp. 31 ("Leonard appeared at Plaintiff[']s home to execute the false arrest.").)  Accordingly, the Court will consider whether Scanlon and Leonard had sufficient probable cause to arrest Plaintiff for the August 2021 incident.

The Rockland Defendants argue that "the RCSD . . . had probable cause to arrest Plaintiff on the evening of August 24, 2021 based upon the information the RCSD received from . . . Ramirez earlier that day regarding Plaintiff's alleged threat toward the RCDAO."  (Rockland Mem. 19.)[33]  In this email, which was forwarded to members of RCSD, Ramirez started by saying that, "[w]ithout mincing words, Mr. Barkai is an EDP," or an emotionally disturbed person.  (Ramirez Email 3.)[34]  After recounting Plaintiff's allegations of a "conspiracy" between

---

[33] DeColyse's knowledge of Ramirez's email is imputed to Scanlon and Leonard under the "collective knowledge doctrine" for the purpose of determining whether Leonard had probable cause to arrest Plaintiff.  *See Savino v. City of N.Y.*, 331 F.3d 63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all." (quotation marks and citation omitted)).

[34] As discussed, *supra* note 6, the Court can review this email as Plaintiff attached it to his Opposition to the Rockland Defendants' Motion To Dismiss.  *See Agu*, 2010 WL 5186839, at *4 n.6.

CPD and RCDAO stemming from his mother's death, as well as the August 2020 incident,

Ramirez outlined what he perceived as a threat against the RCDAO:

> Before the call disconnected, Mr. Barkai began ranting about being of Israeli descent and began comparing himself to a member of Hamas. Specifically, he stated that "I'm not saying I would, but if I were to walk into the [RCDAO] like a Hamas suicide bomber, no one could blame me." This is the only comment that gave me some pause as during the call his rhetoric escalated progressively to this comment and stated that he would be going there (to the DA's office) to complain and demand answers. He appears to be known to [CPD] based on his comments and he may possibly be known to the [RCDAO]. It would be my suggestion to have [CPD] conduct a wellness check on this individual and that the DA's office at least be alerted to the veiled threats being made.

(*Id.*) The Rockland Defendants argue that "[b]ased upon Det. Ramirez's statements within that

email, and the statements that Plaintiff made regarding the RCDAO on that telephone call, there

was probable cause to arrest Plaintiff for, and at the very least, a charge of obstruction of

governmental administration in the second degree pursuant to Penal Law § 195.05," which reads

in relevant part:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function . . . by means of intimidation, physical force or interference, or by means of any unlawful act.

(Rockland Mem. 20 & n.15.) The Court agrees that based upon the information in Ramirez's

email, which was known to RCSD at the time of arrest, Scanlon and Leonard likely had probable

cause to arrest Plaintiff.

  To put it mildly, the language that Plaintiff used on the call with Ramirez and as

recounted in the email could reasonably be interpreted as a threat by Plaintiff against the

RCDAO. Throughout an almost 23-minute call transcript, Plaintiff spent several largely

uninterrupted minutes repeatedly outlining an alleged conspiracy that included, at a minimum,

several police departments, a hospital, and a district attorney's office. (Ramirez Call Tr. 1–3.)

After being told by Ramirez what the procedure was for an investigation, Plaintiff's rhetoric continued to escalate, comparing the County District Attorney's office's actions to "Nazi shit", stating that he "want[s] these sons of bitches thrown in fucking jail" and alleging that every individual involved was facilitating a "coverup." (*Id*. at 4–5.) Plaintiff later launched into another recitation of the "series of events that have transpired over the course of six months to eight months," calling these events "one flew over the Cuckoo's nest." (*Id*. at 6.) It is at this juncture, seven pages into a nine-page single spaced transcript, where Plaintiff said the following:

> Yeah. I mean, you know what the problem is here—you know what the problem is here. People snap all the time in the world, people snap all the time in the world. And this-this is just so-so terribl[e]. I-I don't know what the word is that honestly, I'm not going to do it. I'm not threatening anybody. I want it to be clear that what I'm about to tell you is simply for the- for the- for the elite- to illiterate [sic] a point. If I were to walk into the [RCDAO], after going to Gaza, I'm Israeli.
>
> So I'm obviously not pro Palestinian. I'm obviously not pro Hamas, but if I went to Gaza and indoctrinated myself into suicide bombing and walked into the district attorney's office and blew myself up, nobody could blame me, but I will not do that. I will not do that. But these laws, what you are doing is you are creating in people hate and-and frustration, and you are letting people have their rights abused. You are letting people be basically raped by the state with no repercussions, no repercussions whatsoever.

(*Id*. at 7.)

Of course, the inquiry for false arrest is based upon whether an arresting officer had probable cause to arrest, *see Murphy*, 118 F.3d at 947, which here would be based upon Ramirez's email recapping the call that was sent to RCSD. However, Plaintiff argues that "Ramirez clearly was confused and did not have his facts straight" and that he "falsely reported an incident that never occurred," because Ramirez did not "allege that any crime had been committed" and Ramirez was "false on the facts" in his email. (Pl's Rockland Opp. 28–29, 31.) However, upon reviewing the call transcript and Ramirez's email, the Court disagrees. Indeed,

Ramirez recapped the alleged threat stated by Plaintiff in the context of Plaintiff's intention to visit the RCDAO's office.  Though Plaintiff's statement is phrased as a hypothetical and littered with caveats that he is "not threatening anybody," he said that he would suicide bomb the RCDAO's office and that "nobody could blame [him]" if he did so.  (Ramirez Call Tr. 7.)  The Court has no doubt that this statement would be interpreted by a reasonable law enforcement officer as a threat.  *See* Gates, 462 U.S. at 231 (describing probable cause as viewed through the lens of a "reasonable and prudent" person).  Moreover, Ramirez noted that Plaintiff's statements could be interpreted as non-threatening, but related that Plaintiff's statements "gave [him] such pause" that he still felt the need to notify others.  (*See* Ramirez Email 3 ("Specifically, he stated that "I'm not saying I would . . . .'").)

Plaintiff also alleges that the call with DeColyse did not establish probable cause because DeColyse knew that Plaintiff was in lower Manhattan at the time and not on his way to the RCDAO.  (Pl's Rockland Opp 28–29.)  However, RCSD was not required to credit Plaintiff's self-serving statement that he was in Manhattan.  *See Tavarez v. Huggler*, No. 18-CV-11018, 2020 WL 1151312, at *3 (S.D.N.Y. Mar. 10, 2020) ("Arresting officers do not have to credit or investigate an arrestee's self-serving claims." (alterations, quotation marks, and citation omitted)).  Moreover, a reasonable officer could have found that, based on the email, Plaintiff had the requisite intent to carry out the alleged threat, because there was "at least some evidence" of Plaintiff's intent to come to the RCDAO, coupled with Plaintiff's threat against the office.  *See Kass v. City of N.Y.*, 864 F.3d 200, 210 (2d Cir. 2017) ("[B]ecause the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." (quotation marks and citation omitted)); *Wagner v. City of N.Y.*, No. 14-

CV-2521, 2015 WL 5707326, at *3 (S.D.N.Y. Sept. 28, 2015) ("[W]here a specific level of intent is an element of the crime, an arresting officer must have 'at least some evidence' of the required intent to establish probable cause." (quotation marks and citation omitted)).

Finally, Plaintiff's protestations regarding his own state of mind in the moment are not dispositive. (*See* Pl's Rockland Opp. 28–32.)  Because the test of probable cause is an objective one, "an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior."  *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *see also Graham v. Connor*, 490 U.S. 386, 388, 396 (1989) (holding that the standard for determining whether excessive force was used in making an arrest is an "objective reasonableness" test, which "must be judged from the perspective of a reasonable officer on the scene"); *Aponte v. Kanbur*, No. 20-624, 2021 WL 3854069, at *5 (2d Cir. Aug. 30, 2021) (summary order) (noting that an "arrestee's subjective belief regarding the situation . . . [is] simply irrelevant" to the analysis).  Indeed, even if the Court were to credit Plaintiff's assertion that his statement was not a threat, the Court would nonetheless find that probable cause existed in light of the remaining aspects of the call, which Plaintiff does not dispute.  *See Hicks v. City of N.Y.*, No. 12-CV-5081, 2015 WL 5774575, at *6 (E.D.N.Y. Aug. 27, 2015) (recommending granting motion to dismiss on false arrest claim notwithstanding the plaintiff's different version of events because that version nonetheless gave rise to probable cause), *report and recommendation adopted*, 2015 WL 5774658 (E.D.N.Y. Sept. 30, 2015); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) ("Even where factual disputes exist, as in this case, a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest.").  In light of the allegations, as well as the recordings and documents that the Court may properly consider, the Court holds that Scanlon and Leonard had probable cause to effectuate Plaintiff's

arrest and grants the Rockland Defendants' Motion with respect to Plaintiff's false arrest and malicious prosecution claims against Scanlon, Leonard, and DeColyse.

As to Plaintiff's First Amendment claims, the Court need not determine whether Plaintiff's statements ventured beyond the outer limits of the First Amendment's protections: Plaintiff's First Amendment claim against DeColyse, Scanlon, and Leonard falters insofar as he fails to allege a causal nexus between the allegedly retaliatory motive and Defendants' actions where probable cause existed. *See Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992) (holding that there was no First Amendment violation where arrest and prosecution were supported by probable cause); *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990) (holding that the plaintiff's evidence of retributive motive was insufficient to raise genuine issue as to impropriety of arrest and prosecution for which defendant had probable cause); *Walsh v. City of N.Y.*, No. 19-CV-9238, 2021 WL 1226585, at *5 (S.D.N.Y. Mar. 31, 2021) ("The existence of probable cause [generally] defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." (quoting *Caravalho v. City of N.Y.*, 732 F. App'x 18, 23 (2d Cir. 2018) (summary order))); *Graziani v. Mulligan*, No. 11-CV-1603, 2012 WL 1565278, at *3 (D. Conn. May 2, 2012) (holding that "the plaintiff's retaliation claims cannot be maintained if the arrest . . . [was] supported by probable cause independent of the defendants' motive" (citing *Singer*, 63 F.3d at 120)).  Thus, because Scanlon and Leonard (and DeColyse, if involved) had probable cause to effectuate Plaintiff's arrest, the Rockland Defendants' Motion with respect to Plaintiff's First Amendment retaliation claim against Scanlon, Leonard, and DeColyse is granted.

### 3.  Equal Protection Claim

Plaintiff also appears to raise an equal protection claim directed at the Clarkstown Defendants, stating that "[i]t is a violation of equal protection for citizens of New York City to

be protected from illegal police conduct by the implementation of cameras while citizens . . . in Clarkstown [are] denied access to such exculpatory evidence." (Compl. 16.) However, in his papers, Plaintiff appears to expand this equal protection claim to the 2020 harassment charges stating that "OPD and RCDAO violated their oath of office and the laws of the State of New York and the Constitution of the United States and charged Plaintiff with no investigation and zero probable cause," asking "[if] this is not a violation of the legal doctrine of 'equal protection' then what is?" (Pl's Rockland Opp. 16.) While this Court has dismissed the claims related to the 2020 harassment charges against all of the individual defendants, *see supra* Section II.B.1.a–f., the Court will liberally construe Plaintiff's equal protection claims to apply to all remaining claims in this Action: claims against Culianos and Neuendorf regarding Plaintiff's August 2020 seizure, as well as claims against DeColyse, Leonard, and Scanlon regarding Plaintiff's August 2021 arrest.

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from "invidious discrimination in statutory classifications and other governmental activity." *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same). Therefore, "[t]o state a claim for an equal protection violation, [a plaintiff] must allege that a government actor intentionally discriminated against [him or her] on the basis of race, national origin or gender." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). A plaintiff can plausibly allege intentional discrimination in three ways: (1) "a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender"; (2) "a

law which is facially neutral violates equal protection if it is applied in a discriminatory fashion";
or (3) "a facially neutral statute violates equal protection if it was motivated by discriminatory
animus and its application results in a discriminatory effect." *Id.* (citations omitted).

Here, Plaintiff plainly fails to allege any of these three forms of discrimination.  (*See
generally* Compl.; FAC; SAC.)  "There is no allegation in the [Amended] Complaint of any
'similarly-situated' individuals who were treated differently[,]" and "[t]o the extent that Plaintiff
may be pleading a 'class of one' equal protection claim, he also fails to mention it in the
[Amended] Complaint." *Lombardi v. Suffolk County*, No. 04-CV-1216, 2007 WL 446733, at *7
(E.D.N.Y. Feb. 7, 2007); *see also Whitt v. Buffalo Transp. Inc.*, No. 17-CV-673, 2018 WL
375844, at *2 (W.D.N.Y. Jan. 11, 2018) ("The 'liberal' construction of pro se pleadings does not
render *Twombly* and *Iqbal* toothless—where [the] [p]laintiff fails to even mention race, or
actions regarding any other protected class, his claims of . . .  discrimination . . . cannot, as
pleaded, survive dismissal." (italics omitted)).

The Court construes Plaintiff's allegations to assert a "class of one" equal protection
claim.  (*See* Pl's Rockland Opp. 16 ("Here Plaintiff is clearly a 'class of one' because Plaintiff
cannot find any relevant case law where a son was charged as a criminal for upholding his family
rights under the New York State Patients Bill of Rights in speaking on behalf of his dead
mother.").)  "[A] 'class of one' equal protection claim requires that (1) [the plaintiff] was treated
differently from others similarly situated in all relevant respects, (2) the defendant had no
rational basis for the different treatment, and (3) the different treatment resulted from a non-
discretionary state action." *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378,
at *9 (S.D.N.Y. Feb. 23, 2015) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604
(2008)); *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010)

("Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.  Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." (quotation marks and citation omitted)).   Applying this standard to Plaintiff's claim, the Court finds that Plaintiff has failed to state a class of one equal protection claim, as Plaintiff has not identified a single comparator to plausibly establish disparate treatment.  *See Dubarry v. Annucci*, No. 21-CV-5487, 2022 WL 4485359, at *9 (S.D.N.Y. Sept. 27, 2022) (granting summary judgment where the plaintiffs failed to show how the alleged discriminatory policy impacted them differently from other prisoners); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 572–73 (S.D.N.Y. 2012) (dismissing equal protection claim where "[t]he totality of [the] [p]laintiff's allegations regarding his [e]qual [p]rotection claim is a conclusory assertion, without any detail, that [the] [d]efendant differed in its 'treatment to other similarly situated property owners'" (collecting cases)).

Accordingly, Plaintiff fails to allege an equal protection violation and grants Defendants' Motions To Dismiss with respect to all claims sounding in equal protection.

### 4.  Due Process

Plaintiff raises several vague due process claims throughout his Complaints, stating in relevant part that he was "deprive[d] . . . of [his] liberty under false charges with no due process

in manipulation of the [New York] Mental Hygiene Law[.]"  (*See* Compl. 16.)[35]  For completeness given the overlapping claims, the Court will again address Plaintiff's potential due process claims related to Defendants and incidents remaining in the Action: claims against Culianos and Neuendorf regarding Plaintiff's August 2020 seizure, as well as claims against DeColyse, Leonard, and Scanlon regarding Plaintiff's August 2021 arrest.  The Court interprets Plaintiff's references to due process, in light of their respective contexts, as raising both substantive and procedural due process claims.

<u>a.  Substantive Due Process</u>

The principle of substantive due process prohibits certain state actions "regardless of the fairness of the procedures used to implement them."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotation marks and citation omitted).  But where a constitutional wrong is alleged and the protection at issue is governed specifically by a constitutional amendment, "that Amendment, not the generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Graham*, 490 U.S. at 395; *see also Bryant v. City of N.Y.*, 404 F.3d 128, 136 (2d Cir. 2005) (finding that post-arrest denial of desk appearance ticket cannot support a claim of denial of substantive due process because the Fourth Amendment provides the proper analytical framework).  "As such, there is some conflict within [the Second] Circuit as to whether substantive due process claims can coexist with Fourth Amendment claims in the context of involuntary hospitalizations."  *Matthews v. City of N.Y.*, No. 15-CV-2311, 2016 WL

---

[35] Plaintiff has also raised due process claims regarding the 2020 harassment charges. (*See, e.g.* FAC 7–8, 13, 18 (alleging that MNH defendants, OPD, Neuendorf violated Plaintiff's due process rights).)  As to the Defendants who filed motions to dismiss (i.e. Rockland and Clarkstown), these claims have been dismissed from this litigation for failure to allege personal involvement.  The Court discusses the claims against the MNH Defendants below in Section II.B.7.  The Court declines to address these claims as to the remaining Defendants who have not yet been served in the litigation.

5793414, at *5 (S.D.N.Y. Sept. 30, 2016) (comparing two cases that considered substantive due process claims arising from an involuntary civil commitment without discussion of the Fourth Amendment with two cases that dismissed substantive due process claims as duplicative of Fourth Amendment-based claims).

Notwithstanding this tension, the fact that the Second Circuit's precedent regarding involuntary civil confinement as a substantive due process issue pertains strictly to hospital personnel, *see Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010), and "[i]n light of the Supreme Court's prior admonition against creating substantive due process rights where other Amendments provide relief, the absence of an explicit standard designed for responding authorities, and the manner in which the garden-variety probable cause analysis under the Fourth Amendment can defeat a substantive due process claim," the Court is persuaded that substantive due process claims cannot be brought "against law enforcement officers who bring a person into a hospital" in the civil confinement context. *Matthews*, 2016 WL 5793414, at *6. As such, to the extent that Plaintiff alleges substantive due process claims against Culianos and Neuendorf for his August 2020 seizure under New York's Mental Hygiene Law, the Court dismisses these claims.

For similar reasons, to the extent Plaintiff is bringing substantive due process claims related to the August 2021 incident, these claims fail. "[T]he Fourteenth Amendment right to substantive due process will not support a federal claim for malicious prosecution," because the proper vehicle for this type of claim is the Fourth Amendment. *Singer*, 63 F.3d at 114. And, "[b]ecause claims for unlawful arrest are governed by the Fourth Amendment, Plaintiff may not seek relief for this alleged unlawful arrest under the rubric of a denial of his substantive due process rights." *Harford v. Cnty. of Broome*, 102 F. Supp. 2d 85, 95 (N.D.N.Y. 2000) (citing

*Tenenbaum v. Williams*, 193 F.3d 581, 599–600 (2d Cir. 1999)).  Therefore, to the extent that Plaintiff alleges substantive due process claims against DeColyse, Leonard, and Scanlon regarding Plaintiff's August 2021 arrest, the Court dismisses these claims.

<u>b.  Procedural Due Process</u>

Because the Fifth Amendment Due Process Clause applies only to the federal government, Plaintiff's due process claim arises solely from the Fourteenth Amendment.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"); *Schwamborn v. Cnty. of Nassau*, No. 06-CV-6528, 2008 WL 4282607, at *6 n.5 (E.D.N.Y. Sept. 16, 2008) (explaining that the plaintiff could not bring a Fifth Amendment claim against the county defendants as they were not federal officials), *aff'd*, 348 F. App'x 634 (2d Cir. 2009); *Mitchell v. Home*, 377 F. Supp. 2d 361, 372–73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials.  Any due process rights [the] plaintiff enjoys as against state government officials . . . arise solely from the Fourteenth Amendment due process clause." (citation omitted)).

Pursuant to the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV; *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (holding that a procedural due process violation arises under the Fourteenth Amendment when a plaintiff has been deprived of a constitutionally protected interest in life, liberty, or property without due process of law).  The Due Process Clause protects "the individual against arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see also Zherka v. Ryan*, 52 F. Supp. 3d 571, 582 (S.D.N.Y. 2014) (same).  To state a procedural due process claim, a plaintiff "must first establish

that he enjoyed a protected liberty interest." *Arce*, 139 F.3d at 333.  If a plaintiff establishes such a protected interest, the next question is whether "the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

As relevant to Plaintiff's claims against Culianos and Neuendorf regarding Plaintiff's August 2020 seizure, NYMHL § 9.41 reads, in full:

> Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.  Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40 of this article, or pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

NYMHL § 9.41(a).  Importantly, "§ 9.41 does not provide any specific procedure or hearing prior to being transported to a hospital or psychiatric emergency program." *Matthews*, 2016 WL 5793414, at *7.  Accordingly, "individuals cannot assert a procedural due process claim under this statute." *Id.*; *see also Barkai*, 2022 WL 4357923, at *25–26.

In addition, Plaintiff fails to allege a procedural due process claim related to the August 2021 arrest as it is "merely duplicative of [his] other claims that are explicitly protected under other constitutional sources," namely, the Fourth Amendment.  *Cabello-Setlle v. Cnty. of Sullivan*, No. 21-CV-7477, 2022 WL 4387637, at *11 (S.D.N.Y. Sept. 22, 2022); *see also Levantino v. Skala*, 56 F. Supp. 3d 191, 203 (E.D.N.Y. 2014) (collecting cases) (dismissing plaintiff's procedural due process claims predicated upon same factual basis as false arrest and false imprisonment claims).

Accordingly, the Court grants Defendants' Motions to dismiss with respect to all claims sounding in procedural due process violations.

### 5.  *Monell* Claims

Finally, Plaintiff brings two *Monell* claims against Rockland County and the RCSD.  "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right."  *Sykes*, 723 F.3d at 405–06.  However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cnty.*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *report and recommendation adopted sub nom.*, *Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("Plaintiff fails to allege the existence of any other similar incident, which dooms [p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the

municipality." (citation and quotation marks omitted)); *Santana v. City of N.Y.*, No. 15-CV-6715*, 2018 WL 1633563, at \*10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'" (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998))); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of N.Y.,* No. 21-CV-5098, 2022 WL 4331304, at \*11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  A plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs'

injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of N.Y.,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (finding that the plaintiff "fails to state a *Monell* claim" because the plaintiff "has not pled facts demonstrating a direct link between his injuries and the alleged municipal policy"); *Johnson v. City of N.Y.*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks and citation omitted)).

Because Plaintiff has failed to allege a violation of his constitutional rights by the Rockland Defendants, he cannot assert liability against Rockland County or RCSD under *Monell.  See DeRaffele v. City of New Rochelle*, No. 15-CV-282, 2017 WL 2560008, at *6 (S.D.N.Y. June 13, 2017) ("It is well established that a *Monell* claim cannot lie in the absence of an underlying constitutional violation."); *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . ; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

Even if Plaintiff stated a constitutional claim, Plaintiff's allegations for municipal liability fall far short of the requirements of *Monell*.  In opposition to the Rockland Defendants' Motion, Plaintiff alleges that "Rockland County can be held accountable for the continued almost two year malicious prosecution against Plaintiff by the RCDAO where Defendants have shown time and again a pattern, which when taken together constitutes a clear custom of lying and of failing to uphold the law and using their power and authority to pervert the course of justice against one individual who at no time broke any law . . . ."  (Pl's Rockland Opp. 34–35.)  Plaintiff continues, recounting specific instances that refer only to his own case and then claiming these instances

taken together constitute "customs" that are widespread.  (*Id*. at 35–36.)  Though Plaintiff is

unclear as to which theory of *Monell* he is invoking, the Court construes Plaintiff's argument as

one of a "widespread practice."  To demonstrate a practice is sufficiently widespread to

constitute a custom under *Monell*, the practice must be so "persistent and widespread," or so

"permanent and well settled as to constitute a 'custom or usage' with the force of law" and to

"imply the constructive knowledge of policymaking officials."  *In re N.Y.C. Policing During

Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (citing *Sorlucco v.

N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992); *see also Triano v. Town of Harrison*, 895

F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice constitutes a custom

under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled"

(citing *Praprotnik*, 485 U.S. at 127)).  Plaintiff does not point to any instance of Rockland

County allegedly implementing this widespread practice beyond his own case.  This alone would

be fatal to Plaintiff's *Monell* claim, even if he had asserted a viable underlying Constitutional

violation.  *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June

22, 2017) (dismissing claims where "Plaintiff seems to allege the existence of a practice adopted

by the [County] solely based on Plaintiff's alleged experience"); *Gordon v. City of N.Y.*, No. 10-

CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where

the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in

his particular case") (citations omitted).

Therefore, Plaintiff's *Monell* claim is dismissed.

### 6.  Abuse of Process

"In order to establish liability for malicious abuse of process under § 1983, a plaintiff

must establish the claim's elements under state law as well as the deprivation of a constitutional

right."  *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. 2012), *aff'd*, 523

F. App'x 770 (2d Cir. 2013) (summary order).  Under New York law, a plaintiff may assert an abuse of process claim against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Savino*, 331 F.3d at 76 (alterations omitted) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

Plaintiff's claim falters on the third and final element of the claim—often referred to as "[t]he crux of a malicious abuse of process claim," *Kraft v. City of N.Y.*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011)—the collateral objective.  To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose."  *Savino*, 331 F.3d at 77; *see also Lopez-Motherway v. City of Long Beach*, No. 20-CV-5652, 2021 WL 965158, at *4 (E.D.N.Y. Mar. 15, 2021) ("To establish a collateral objective, a plaintiff must prove that the defendants 'acted not merely with an improper motive, but to achieve an improper purpose.'" (quoting *Scott v. City of N.Y.*, No. 16-CV-834, 2020 WL 208915, at *12 (E.D.N.Y. Jan. 14, 2020))).  In other words, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, [the plaintiff] must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."  *Savino*, 331 F.3d at 77.  Examples of collateral objectives can include "infliction of economic harm, extortion, blackmail or retribution."  *Wagner v. Hyra*, No. 19-CV-4, 2021 WL 475331, at *8 (N.D.N.Y. Feb. 10, 2021) (alteration omitted) (quotation marks and citation omitted); *see also Hoffman*, 893 F. Supp. 2d at 449–50 (listing examples of collateral objectives).

Simply put, Plaintiff has failed to allege a collateral objective.  Plaintiff has stated in only the most general terms that the Defendants used judicial process "to protect themselves . . . in violation of their oath," (Pl's Rockland Opp. 15), but Plaintiff does not articulate what, exactly, this otherwise nebulous and unnamed collateral objective was.  In his Complaints, Plaintiff also alleged that Defendants showed "clear retaliatory harassment meant to abuse and pervert the course of justice," (FAC 10), but again, this is not nearly specific enough to constitute a collateral objective.  *See Twombly*, 550 U.S. at 555 (holding that "a formulaic recitation of the elements of a cause of action will not do" to survive a motion to dismiss).  Having provided no more than a "naked assertion[ ] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted), Plaintiff fails to plausibly state an abuse of process claim.  Accordingly, the Rockland and Clarkstown Motions with regard to Plaintiff's abuse of process claim are granted.  *See Lopez-Motherway*, 2021 WL 965158, at *4 (dismissing claims for abuse of process under § 1983 where the "[p]laintiff has failed to allege a collateral objective"); *Hoffman*, 893 F. Supp. 2d at 449 (collecting cases to show that "the collateral objective requirement is not satisfied by actions taken in prosecuting a case, even if done with a vindictive or vicious motive in an effort to prevail in the prosecution").

### 7.  MNH Defendants

While Plaintiff has not yet properly served any of the MNH defendants, the Court will review Plaintiff's allegations in light of clear precedent dictating the outcome of Plaintiff's claims.

A claim for relief under § 1983 must allege facts showing that the defendant acted under the color of a state "statute, ordinance, regulation, custom or usage[.]"  42 U.S.C. § 1983.  "Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person

acting under the color of state law, or a 'state actor.'" *Burgdorf v. Betsy Ross Nursing and Rehabilitation Ctr. Inc.*, No. 22-CV-987, 2023 WL 112092, at *5 (N.D.N.Y. Jan. 5, 2023) (citing *West v. Atkins*, 487 U.S. 42, 48–49 (1988)). Private parties are generally not state actors, and are therefore not usually liable under § 1983. *See Sykes*, 723 F.3d at 406 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties. . . ." (quotation marks and citation omitted)).

In the § 1983 context, the actions of a nominally private entity are attributable to the state when: "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Caballero v. Shayna*, No. 18-CV-1627, 2019 WL 2491717, at *3 (E.D.N.Y. June 14, 2019) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Id*. (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

Liberally construed, Plaintiff's Complaints raise allegations of First Amendment retaliation, due process violations, and malicious prosecution pursuant to § 1983 against the MNH defendants. (*See* FAC 7.) However, MNH is a privately owned facility or medical group. *See Who We Are*, Montefiore Nyack, https://www.montefiorenyack.org/who-we-are (last visited Mar. 3, 2023) ("As part of the Montefiore Health System, Montefiore Nyack Hospital brings the

innovations and expertise of a renowned academic medical center to Rockland County.");  U.S.

Dept. of Housing and Urban Dev., *Monefiore Med. Ctr. Bronx, N.Y.*,

https://www.hud.gov/federal_housing_administration/healthcare_facilities/section_242/success_

stories/montefiore_medical_center (last visited Mar. 3, 2023)  ("Montefiore is a private, non-

profit 501(c)(3), acute care hospital with a voluntary governing board, and is the University

Hospital for the Albert Einstein College of Medicine.").[36]  Plaintiff has not alleged facts

plausibly suggesting that MNH is a state actor, nor described how their actions are otherwise

fairly attributable to the state.

Instead, Plaintiff argues that MNH employees were "intricately aware and involved" in

Plaintiff's prosecution for harassment and their "participation must be seen as a matter of policy

to knowingly violate [his] rights unto the hospital," because their actions related to Plaintiff's

mother's death, and as such "the hospital is responsible for upholding this law."  (FAC 7.)

Construed quite liberally, Plaintiff may be alleging that MNH is a "joint actor" with the

government, because without their initial complaints to the police, the harassment allegations

would not have resulted in the short-lived prosecution of Plaintiff for harassment.

"Under the 'joint action' doctrine, a private actor can be found 'to act under color of state

law for § 1983 purposes if . . . the private party is a willful participant in joint action with the

State or its agents."  *Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *8

(E.D.N.Y. 2011) (alteration omitted) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).  "The

---

[36] "When considering a motion made pursuant to Rule 12(b)(6), the Court may take judicial notice of 'documents retrieved from official government websites'. . . ."  *Jones v. Cuomo*, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y. 2021) (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015)); *see also, e.g., J.T. v. de Blasio*, 500 F. Supp. 3d 137, 149 (S.D.N.Y. 2020) (taking judicial notice of documents "that were published on an official government website"); *Williams v. PMA Cos.*, 419 F. Supp. 3d 471, 484 (N.D.N.Y. 2019) (same).

touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state actors]." *Forbes v. City of N.Y.*, No. 05-CV-7331, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).  "Mere cooperation with a state official . . . is insufficient to establish state action." *Estiverne v. Esernio-Jenssen*, 910 F. Supp. 2d 434, 442 (E.D.N.Y. 2012) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *San Filippo v. U.S. Tr. Co. of N.Y.*, 737 F.2d 246, 252, 256 (2d Cir. 1984)).  Instead, "a plaintiff must show that the private citizen and the state official shared a common unlawful goal." *Hollman*, 2011 WL 280927, at *8 (quotations marks and citation omitted).

Plaintiff has not sufficiently alleged that MNH and its employees "shared a common goal" with any state actor.  First, Plaintiff does not allege with which municipal or state entity MNH shared a common goal.  (FAC 6–10.)  Assuming that Plaintiff is asserting MNH worked with some combination of OPD and RCDAO, Plaintiff has not described any "plan, prearrangement, conspiracy, custom, or policy" shared between the hospital and the various state agents.  *Forbes*, 2008 WL 3539936, at *5.

Likewise, MNH employees Geller, DeLorenzo, Hastings, and Nguyen are also private actors.[37]  Because Plaintiff has failed to plausibly allege that the MNH Defendants acted under color of state law, or otherwise could be deemed state actors, Plaintiff fails to state any claim for relief against these Defendants under § 1983.  *See DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 69 (E.D.N.Y. 2019) (acknowledging that, in the context of § 1983, public functions do not include operating nursing homes) (citing *Manhattan Cmty. Access Corp.*

---

[37] Moreover, the Court is skeptical that individual employees exercising their right to complain about alleged harassment could, on its own, create a relationship between a private entity and the state sufficient to impute § 1983 liability.

*v. Halleck*, ––– U.S. ––––, 139 S. Ct. 1921, 1926 (2019)); *White v. St. Joseph's Hosp.*, 369 Fed.

App'x 225, 226 (2d Cir. 2010) (summary order) ("[P]rivate actors and institutions, such as the

hospitals, nursing home, and cemetery named as defendants in [plaintiff's] complaint, are

generally not proper § 1983 defendants because they do not act under color of state law.");

*Thomas v. Mohawk Valley Health Sys.*, No. 20-CV-1347, 2020 WL 6504634, at *6 (N.D.N.Y.

Nov. 5, 2020) (rejecting plaintiff's argument that defendant Mohawk Valley Health System was

a state actor, merely because it was a private institution that received public funding).

Accordingly, Plaintiff's claims against the MNH are dismissed.

### 8.  Remaining Defendants

Finally, Plaintiff has filed two amended complaints to address deficiencies in his original

pleadings.  (*See* FAC; SAC.)  However, several Defendants listed in the amended complaints

have yet to be served.

Because Plaintiff has been granted permission to proceed in forma pauperis ("IFP"), he is

entitled to rely on the Court and the U.S. Marshals Service to effect service.  *Walker*, 717 F.3d. at

123 n.6; *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process

. . . in [IFP] cases."); Fed. R. Civ. P. 4(c)(3) (the court must order the Marshals Service to serve

if the plaintiff is authorized to proceed IFP).  To allow Plaintiff to effect service on Defendants

Donnegan, Butterworth, Palazolo, Gorcynski, Ryan, and Orangetown Police Department, the

Clerk of Court is instructed to fill out a U.S. Marshals Service Process Receipt and Return form

("USM-285 form") for each of these Defendants.  The Clerk of Court is further instructed to

issue summonses and deliver to the Marshals Service all of the paperwork necessary for the

Marshals Service to effect service upon Defendants.

III.  Conclusion[38]

For the foregoing reasons, the Clarkstown Defendants' Motion is denied in part and granted in part, and the Rockland Defendants' Motion is granted.  Specifically, as to the Clarkstown Defendants, Plaintiff's claims under the Fifth and Fourteenth Amendments are dismissed.  Plaintiff's First and Fourth Amendment claims against Culianos survive.  Plaintiff's First and Fourth Amendment claims against all other Clarkstown Defendants are dismissed.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice.  *See Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").  Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein.  The amended complaint will replace, not supplement, the complaint currently before the Court.  It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider, including the identification of individuals and the nature of their involvement.  If Plaintiff fails to abide by the 30-day deadline, the claims that are dismissed could be dismissed with prejudice.  In addition, to the extent that Plaintiff amends the complaint to include defendants who have been dismissed from this Action through this Opinion, and who

---

[38] Plaintiff has also requested this Court to issue a declaratory judgment stating that "Walsh . . . and the RCDAO did bring charges against [P]laintiff with no probable cause" so that Plaintiff can pursue an action before the New York State Bar Association Disciplinary Committee against Walsh.  (SAC 1; *see also* Pl's Rockland Opp. 37–39.)  "However, violations of the Rules of Professional Conduct give rise to no private right of action."  *Anderson v. Greene*, No. 14-CV-10249, 2016 WL 4367960, at *30 (S.D.N.Y. Aug. 10, 2016) (collecting cases), *aff'd*, 774 Fed. Appx. 694 (2d Cir. 2019) (summary order), *cert. denied*, 140 S.Ct. 556 (2019).  Accordingly, Plaintiff's request for declaratory judgment must be dismissed.

previously have not been served, Plaintiff must make a separate application to the Court after filing the amended complaint to request an Order of Service for those defendants.

The Clerk of Court is instructed to issue summonses for Defendants Donnegan, Butterworth, Palazolo, Gorcynski, Ryan, and Orangetown Police Department; complete the USM-285 forms with the addresses for these defendants; and deliver to the U.S. Marshals Service all documents necessary to effect service.

The Clerk of Court is also respectfully directed to terminate the pending Motion, (Dkt. No. 144), and to mail a copy of this Opinion & Order to Plaintiff's address listed on the docket. The Court will hold a status conference on May 1, 2023, at 12:00 PM.

SO ORDERED.

Dated:   March 29, 2023
         White Plains, New York

_____
          KENNETH M. KARAS
        United States District Judge