UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARIEL D. BARKAI

                              Plaintiff,

        v.

ANTHONY CULIANOS, *et al*.

                              Defendants.

---

No. 21-CV-4060 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Ariel D. Barkai
Fort Lauderdale, FL
*Pro Se Plaintiff*

John M. Flannery, Esq.
Eliza M. Scheibel, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Ariel D. Barkai ("Plaintiff"), proceeding pro se, brings this lawsuit, pursuant to 42

U.S.C. § 1983 ("Section 1983") against Anthony Culianos ("Culianos") and Kyla Caraballo

s/h/a Officer Donegan ("Donegan") (collectively, "Defendants"). (*See generally* Fourth Am.

Compl. ("FAC") (Dkt. No. 78).) Before the Court is Defendants' Motion for Summary

Judgment, (*see* Mot. for Summ. J. ("Defs. Mot.") (Dkt. No. 576)), as well as Plaintiff's Cross-

Motion for Summary Judgment against Donegan, (*see* Pl. Cross-Mot. for Summ. J. ("Pl. Mot.")

(Dkt. No. 584)), and Plaintiff's Daubert Motion, (*see* Pl. Daubert Mot. (Dkt. No. 598).)

For the following reasons, Defendants' Motion is granted and Plaintiff's Motions are denied.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, or to relevant evidence where necessary.[1]

### 1. Prior Mental Health Incidents

In the eighteen months leading up to August 31, 2020, Plaintiff was the subject of at least thirteen calls for service involving the Clarkstown Police Department ("CPD"). (*See* Defs. 56.1 Stmt. ("Defs. 56.1") ¶ 20 (Dkt. No. 578); Pl. Counter 56.1 Stmt. ("Pl. Counter 56.1") ¶ 20 (Dkt. No. 601).) These included: a call placed by Plaintiff to CPD because he had not received adequate service from a cable company, (*see* Defs. 56.1 ¶ 22; Pl. Counter 56.1 ¶ 22), a call from Airbnb advising CPD that Plaintiff had threatened to kill himself within the next hour, (*see*

---

[1] Plaintiff's 56.1 statement fails, at myriad points, to support Plaintiff's claims with "citation[s] to evidence that would be admissible." Local Rule 56.1(d). Where this is the case, the Court may deem the Defendants' facts admitted. *See Al Thani v. Hanke*, No. 20-CV-4765, 2024 WL 4265196, at *3 n.1 (S.D.N.Y. Sept. 23, 2024) (concluding the same where the defendants failed to submit "counterstatements followed by citation to evidence which would be admissible" and collecting cases (internal citations and quotation omitted)).

However, "where a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Taylor v. Quayyum*, No. 16-CV-1143, 2023 WL 5293383, at *6 (S.D.N.Y. Aug. 17, 2023) (quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)). Here, because Plaintiff has failed to comply with Local Rule 56.1(d), the Court will "conduct its own 'assiduous review of the record.'" *Id.* (quoting *Keawsri v. Ramen-Ya Inc.*, No. 17-CV-2406, 2021 WL 3540671, at *3 (S.D.N.Y. Aug. 10, 2021)). "[T]he Court has confirmed that each fact asserted in [Defendants' and Plaintiff's] Rule 56.1 statements that is relied upon in this Opinion and Order is supported by its corresponding citation to the record. The Court otherwise cites directly to the record." *Al Thani*, 2024 WL 4265196, at *3 n.1.

Defs. 56.1 ¶ 25; Pl. Counter 56.1 ¶ 25), a call from the Small Business Administration ("SBA")

reporting that Plaintiff had told the SBA "he would hang himself if he did not receive a loan,"

(*see* Defs. 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33), as well as two calls from Wells Fargo alleging that

Plaintiff had threatened to commit suicide if he were denied a loan, (*see* Defs. 56.1 ¶¶ 42, 44;

Pl. Counter 56.1 ¶¶ 42, 44).  Culianos was dispatched to respond to some of these incidents,

including the incident reported by the Small Business Administration, (*see* Defs. 56.1 ¶¶ 34–35;

Pl. Counter 56.1 ¶¶ 34–35), and the incident involving the cable service company, (*see* Defs.

56.1 ¶¶ 23–24; Pl. Counter 56.1 ¶¶ 23–24).

    2.  Events of August 31, 2020

On August 31, 2020, Detective Robert Neuendorf placed a call to CPD dispatch, stating:

> I had an individual known to you all as a suicide risk, his name is Ariel Barkai, I've
> been working with Jeff Wanamaker on this, but I haven't been able to get ahold of
> him . . . but Ariel Barkai, who has been calling here and causing a stir and had to
> be removed from our office space . . . a month ago . . . Today he just called and said
> he's thinking about committing suicide, so I was hoping you could have a unit do
> a welfare check on him.

(*See* Defs. 56.1 ¶ 50; Pl. Counter 56.1 ¶ 50).[2]  The CPD dispatcher entered information from

this call into the Call Log notes that both Culianos and Donegan were able to see as the

responding officers.  (*See* Defs. 56.1 ¶ 52; Pl. Counter 56.1 ¶ 52.)  The Call Log noted: "ariel

---

[2] Plaintiff vigorously disputes the veracity and reliability of Neuendorf's statements on the call in question.  (*See* Pl. Counter 56.1 ¶ 50).  However, the truth of Neuendorf's statements is not in issue.  Instead, the question—for the purposes of the Court's inquiry into probable cause and qualified immunity—is whether the officers relied on the information in good faith. *See Brock v. CVS Corp.*, No. 22-CV-4014, 2024 WL 3938363, at *4 (S.D.N.Y. Aug. 26, 2024) ("Probable cause may be based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." (quotation and citation omitted)); *McCarrick v. Owens*, No. 21-CV-6227, 2022 WL 446638, at *3 (W.D.N.Y. Feb. 14, 2022) ("Even if the officer relied on mistaken information, as alleged here, probable cause can exist . . . so long as the arresting officer acted reasonably and in good faith in relying on that information." (alterations adopted and quotations omitted)).

barkai caleld teh DA's office," "numerous issues – blaming da for ruining his left," "tild recptonist depressed and is being suicidal him." (*See* Decl. of Eliza M. Scheibel ("Scheibel Decl.") Ex. D ("Call Log") 4 (Dkt. No. 580-4).) The log further noted that Plaintiff was an EDP ("Emotionally Disturbed Person"). (*See* Call Log 4.) The dispatcher then spoke to Culianos, reporting that "Ariel Barkai was an EDP whose mother died at Nyack Hospital," that "Mr. Barkai blamed the hospital for his mother's death," that "Mr. Barkai had called the DA's Office because he blames them for ruining his life," and that he "just told a receptionist that he's depressed and he's being suicidal." (*See* Defs. 56.1 ¶ 56.) The dispatcher then sent a message to Donegan over the radio which stated: "can you respond to 214 Hilltop Lane with 216, the 113 [EDP] there made a suicidal threat to the DA's Office."[3] (*See id*. ¶ 57.)

Donegan was first to arrive at Plaintiff's house. (*See* Defs. 56.1 ¶ 60; Pl. Counter 56.1 ¶ 60.) She knocked on the door, and when Plaintiff answered it, he was holding two phones, one of which was recording. (*See* Defs. 56.1 ¶ 61; Pl. Counter 56.1 ¶ 61.) Per a recording taken by Plaintiff, the first time that Plaintiff answered the door, Donegan asked Plaintiff "who's that," (presumably in reference to the phone call he was on), to which Plaintiff responded: "work."[4] (*See* Decl. of Eliza M. Scheibel ("Scheibel Decl. V") Ex. NN ("August 2020

---

[3] "Dispatch Code 113 means EDP or Emotionally Disturbed Person." (*See id*. ¶ 15 (internal quotations omitted).)

[4] The August 2020 recording mainly captures the business call that Plaintiff was on at the time of Donegan's arrival. (*See generally* August 2020 Recording.) It captures the interactions between Plaintiff and Defendants only faintly and intermittently. (*See id*.) Plaintiff submitted additional versions of this recording which he claims to have enhanced using AI. (*See* Dkt. No. 636 at 4.) The Court finds that even these "enhanced" versions capture the interaction faintly and intermittently. Therefore, the Court will rely on these recordings only insofar as the interaction is captured clearly by the recordings. *See Pal v. Cipolla*, No. 18-CV-616, 2020 WL 6881455, at *7–8 (D. Conn. Nov. 23, 2020) (relying on audible portions of recording at summary judgment), *aff'd*, No. 20-4222, 2022 WL 766417 (2d Cir. Mar. 14, 2022).

Recording") 5:45–5:46 (Dkt. No. 621-1).)  Plaintiff can then be heard saying "no, not now, not now, not now," with increasing speed, and telling Donegan to leave his property. (*See id*. 5:46–5:49.)  The door can then be heard closing again as Plaintiff re-enters his home, only to return seconds later.  (*See id*. 6:00–6:07.)  In the recording, Donegan can then be heard asking Plaintiff if she can ask him a few questions, (*see id*. 6:22–6:24), while Plaintiff, with apparent rising frustration, tells her he is on a $130 million call, and that she'll have to come back, (*see id.* 6:07–6:31).  Plaintiff then appears to re-enter his home, then put the recording device down. (*See id.* 6:35–6:38.)  About two seconds later, the front door can be heard opening, (*see id.* 6:40), and about 30 seconds later, Plaintiff can be heard yelling.  (*See id*. 7:08–7:11; *see* Pl. Mem. in Opp. Def. Mot for Summ. J. ("Pl. Opp.") 19 (Dkt. No. 599) (conceding that "Plaintiff rais[ed] his voice and [told] Donegan to leave his property").)

Notwithstanding the evidence from the recording, Plaintiff testified at his deposition that he then remained "as calm as he could" and went outside to speak to Donegan, (*see* Scheibel Decl. Ex. U ("Barkai Depo Day 1") 186: 24–25 (Dkt. No. 580-21)), although he does not dispute that he was "anxious" "flustered" or "irate," as he went outside, (*see* Defs. 56.1 ¶ 66; Pl. Counter 56.1 ¶ 66).  It is undisputed that he approached Donegan "with his hands in the air" and told her in an "elevated" and "commanding" voice to get off of his property, (*see* Defs. 56.1 ¶ 66, 68; Pl. Counter 56.1 ¶ 66, 68), although Plaintiff claims his hands were up "so as to assure Donegan he was not armed," (*see* Pl. Counter 56.1 ¶ 66).  As Culianos arrived, Plaintiff was

---

And although Plaintiff has not authenticated these recordings, the Court may nonetheless rely on them at this stage.  *See Roland v. City of New York*, No. 19-CV-2240, 2023 WL 2599649, at *3 n.7 (E.D.N.Y. Mar. 22, 2023) ("[I]n general, even if evidence is not properly authenticated at the summary judgment stage, so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment" (quoting *Jibowu v. Target Corp.*, 492 F.Supp.3d 87, 100 n.8 (E.D.N.Y. 2020)).

commanding Donegan to "get off of his property now." (*See* Defs. 56.1 ¶ 70; Pl. Counter 56.1

¶ 70.)  There is some dispute about what occurred next.  Plaintiff testified that he turned to

Culianos and, mistaking him for another police officer (Aaron Gould) who Plaintiff had recently

interacted with, said "Officer Gould, can you please tell this woman that I'm on a conference

call," (*see* Barkai Depo Day 1 at 190:6–8).  Plaintiff testified that Culianos responded "Aaron

Gould is not your private fucking cop and I don't like the way you're speaking to my partner,"

then "slammed" him into the wall of his home, and placed him in handcuffs.  (*See id.* 190:10–

14.)

Culianos testified that he had no recollection of such an interaction and that he was

"barely able to get a word in" because Plaintiff was "screaming 'get the fuck off of my

property.'"  (*See* Scheibel Decl. Ex. W ("Culianos Depo Day 1") 212:21–24 (Dkt. No. 580-23).)

Culianos' contemporaneous police report states that as he arrived onto the scene, he observed

Plaintiff "pacing, flailing his hands and arms around, and yelling," and that when he went to

speak to Plaintiff, Plaintiff "charged towards [him] at a fast pace, flailing his arms as he

continued screaming incoherently."  (*See* Scheibel Decl. Ex. C ("Police Report") 6 (Dkt.

No. 580-3).)  The police report further states that Plaintiff then turned to return to his residence,

and Culianos, then "held [Plaintiff's] arms, while [] Donegan placed him in handcuffs."

(*See id*.)  Culianos testified that they took Plaintiff to get a psychiatric evaluation because they

were unable to speak to or interview him, and because he was screaming and cursing at

Defendants.  (*See* Culianos Depo Day 1 at 200:2–10.)  The police report further states that

Defendants detained Plaintiff because they had "limited information on how [Plaintiff] was

'being suicidal,'" because of Plaintiff's "erratic behavior" and for "officer safety reasons."

(*See* Police Report 6.)

Plaintiff was transported to Nyack Hospital, where he was determined by one doctor to be in "an acute manic state," and a psychiatric social worker to be presenting as "an extreme case of mania," and where he was found to have a "substantial risk of harm." (*See* Scheibel Decl. Ex. Z. ("Ferrantello Aff.") ¶¶ 19, 20 (Dkt. No. 580-26).) Plaintiff was discharged on September 4, 2020. (*See* Defs. 56.1 ¶ 112; Pl. Counter 56.1 ¶ 112.)

B. Procedural Background

On March 29, 2023, the Court denied Defendant Culianos' Motions to Dismiss. (*See* Dkt. No. 189.) The Court adopted a case management plan on March 22, 2024. (*See* Dkt. No. 285.) Fact discovery was substantially completed by November 20, 2024, (*see* Dkt. No. 529), and expert discovery was substantially completed on November 26, 2024, (*see* Dkt. No. 547.) On December 13, 2024, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (*See* Dkt. No. 552.) Plaintiff responded on December 14, 2024. (*See* Dkt. No. 554.) On December 17, 2024, the Court set a briefing schedule. (*See* Dkt. No. 555.)

Defendants filed their Motion for Summary Judgment on February 3, 2025. (*See* Defs. Mot.; Not. to Pro Se Litigant (Dkt. No. 577); Defs. Rule 56.1; Mem. of Law in Supp. Mot. for Summ. J. ("Defs. Mem.") (Dkt. No. 579); Scheibel Decl.) After requesting, and being granted, an extension, (*see* Dkt. Nos. 590, 591), Plaintiff filed his Opposition on March 3, 2025, (*see* Pl. Opp.) Defendants filed their Reply on March 31, 2025. (*See* Def. Rep. in Supp. of Mot. for Summ. J. ("Def. Rep.") (Dkt. No. 620); Scheibel Decl. II.)

Plaintiff filed a Cross-Motion for Summary Judgment on February 22, 2025, (*see* Pl. Cross Mot. for Summ. J. ("Pl. Mot.") (Dkt. No. 593)), although his Memorandum in Support of the Motion and his Rule 56.1 Statement were filed on February 3, 2025, (*see* Pl. Mem. of Law

in Supp. of Cross Mot. for Summ. J. ("Pl. Mem.") (Dkt. No. 586); Pl. 56.1 Stmt. ("Pl. 56.1")

(Dkt. No. 587)).  Defendants filed their Opposition on March 3, 2025.  (*See* Defs. Mem. in Opp.

to Pl. Mot. for Summ. J. ("Defs. Opp.") (Dkt. No. 596); Aff. of Eliza Scheibel ("Scheibel Decl.

III") (Dkt. No. 595); Defs. Counter 56.1 Stmt. ("Defs. Counter 56.1") (Dkt. No. 594).)  After

requesting (and being granted) an extension, (*see* Dkt. Nos. 610, 612–613), Plaintiff filed his

Reply on March 31, 2025, (*see* Pl. Rep. Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.

Rep.") (Dkt. No. 623); Pl. Resp. to Def. 56.1 ("Pl. Resp. 56.1") (Dkt. No. 624).)

Plaintiff also filed a Motion to Exclude Defendants' expert witness on March 3, 2025.

(*See* Pl. Mot. to Exclude Defs. Expert Testimony ("Pl. Daubert Mot.") (Dkt. No. 598).)

Defendants filed their Opposition on March 31, 2025.  (*See* Def. Mot. in Opp. Pl. Mot. to

Exclude ("Defs. Daubert Opp.") (Dkt. No. 618); Decl. of Eliza Scheibel ("Scheibel Decl. IV")

(Dkt. No. 619).)  After requesting (and being granted) and extension, (*see* Dkt. Nos. 610, 613),

Plaintiff filed his Reply on April 7, 2025, (*see* Pl. Rep. in Supp. of Mot. to Exclude ("Pl.

Daubert Rep.") (Dkt. No. 625).)

On April 10, 2025, Plaintiff requested permission to supplement the record with

additional evidence in light of his improved financial situation.  (*See* Dkt. No. 626.)  After both

Parties had the opportunity to brief the issue, (*see* Dkt. No. 626, 627, 629, 630), the Court

permitted Plaintiff to file the additional evidence, (*see* Dkt. Nos. 631–633).

## II.    Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the

plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")."In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or

other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016); *see also Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("It is well established that a court is ordinarily obligated to afford a special solicitude to pro se litigants"), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Janczuk v. United States*, No. 24-CV-3718, 2024 WL 4483225, at *1 (S.D.N.Y. Oct. 7, 2024); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *7 (S.D.N.Y. Sept. 9, 2024).

B. <u>Analysis</u>

Plaintiff raises false arrest and First Amendment retaliation claims against Defendants. (*See* FAC ¶¶ 83–84, 98.) In support of their Motion, Defendants argue that they had probable cause to detain Plaintiff pursuant to N.Y. Mental Hygiene Law § 9.14 ("NYMHL Section 9.14"), and therefore that Plaintiff's false arrest and First Amendment retaliation claims cannot survive. (*See* Defs. Mem. 11–19, 24–26.) In the alternative, Defendants argue that they had arguable probable cause to detain Plaintiff, and therefore that their actions are shielded by qualified immunity. (*See* Defs. Mem. 19–24.) Plaintiff disputes each of these claims, (*see generally* Pl. Opp.), and argues that the Court should grant summary judgment as to his false arrest claim against Donegan, because it was clearly established that she did not have probable cause to detain him, (*see* Pl. Mem. 14–21.)

11

1.  <u>False Arrest</u>

"A mental health false arrest claim arises from both the Fourth Amendment's protection against unreasonable mental health seizures and the Fourteenth Amendment's due process protections." *Moore v. City of New York*, No. 22-CV-10957, 2024 WL 3361193, at *4 (S.D.N.Y. July 10, 2024) (quoting *Guan v. City of New York*, 37 F.4th 797, 807 (2d Cir. 2022)). "In analyzing [Section] 1983 false arrest claims, [the Court looks] to the law of the state in which the arrest occurred.  In New York, to prevail on a false arrest claim, a plaintiff must show that: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id*. (quoting *Guan*, 37 F.4th at 807).  "An arrest is privileged if it is based on probable cause," *id*., and that standard is met in the context of a mental health arrest where there is probable cause to believe "the individual is a danger to [himself] or others, that is, whether there is a substantial risk of serious physical harm to [himself] or others." *Id*.; *see also Greene v. City of New York*, 725 F. Supp. 3d 400, 417 (S.D.N.Y. 2024) (applying the same standard).  "A showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Greene*, 725 F. Supp. 3d at 417 (alteration adopted) (quoting *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015), *aff'd*, 665 F. App'x 49 (2d Cir. 2016)). "[A] report of a suicide threat does more to establish probable cause," *id*. at 418, but is "generally not sufficient, standing alone, to establish probable cause," *id*.  "Courts determine whether probable cause existed by focusing on the facts available to the arresting officer at the time of the arrest." *Valentine v. Zuzulo*, No. 19-CV-2526, 2021 WL 5910291, at *2 (S.D.N.Y. Dec. 9, 2021).

"Even where actual probable cause does not exist, police officers may be entitled to qualified immunity from a [Section] 1983 false arrest claim if their actions did not violate 'clearly established' rights or if 'arguable probable cause' existed at the time of the arrest." *Guan*, 37 F.4th at 806 (quoting *Dancy v. McGinley*, 843 F.3d 93, 106–07 (2d Cir. 2016)).  First, police officers are immune where "reasonable officers could disagree 'on the legality of the action at issue in its particular factual context,' the officer is entitled to qualified immunity." *Id*. (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).  Second, police officers are immune where they have "arguable probable cause," which the Second Circuit has defined as existing where "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id*.  The question is "'whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that' probable cause existed." *Id*. (emphasis in original) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)).

Here, it is undisputed that the facts known to the officers at the time of Plaintiff's detention were as follows: (1) a CPD dispatcher informed Defendants that Plaintiff had threatened to commit suicide,[5] (*see* Defs. 56.1 ¶¶ 50, 56, 57; Pl. Counter 56.1 ¶ 50; Call Log 4);

---

[5] Plaintiff seems to argue that the report that he was "being suicidal" did not suggest he had threatened to commit suicide.  (*See, e.g.,* Pl. Mem. 6.)  While the Court concedes that the phrasing used by the dispatchers and those who reported Plaintiff's alleged threat was grammatically awkward, it does not agree that there is any substantive communicative difference between "being suicidal" and "threatening to commit suicide."  *See Suicidal*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/suicidal [https://perma.cc/4MJQ-XKG5] (last accessed Apr. 16, 2025) (defining "suicidal" as "[p]eople who are suicidal want to kill themselves or are in a mental state in which it is likely that they will try to do so").

(2) the call log indicated that Plaintiff had a history of being an EDP, and that he blamed the District Attorney's office for "ruining his life," (*see* Call Log 4); (3) Plaintiff opened the door holding two phones, and claiming to be on a $130 million call,[6] (*see* Defs. 56.1 ¶¶ 61, 63; Pl. Counter 56.1 ¶¶ 61, 63; August 2020 Recording 6:07–6:25); (4) upon Donegan's arrival, Plaintiff entered and exited his home numerous times within a period of less than a minute, and became increasingly upset as Donegan requested to ask him questions, (*see* August 2020 Recording 5:46–6:30); and (5) Plaintiff approached Donegan with his "hands in the air" and told her in an "elevated" and "commanding" voice to get off of his property, (*see* Defs. 56.1 ¶¶ 66–68; Pl. Counter 56.1 ¶¶ 66–68). It is undisputed that Culianos had previously responded to two welfare checks on Plaintiff wherein CPD was informed that Plaintiff had threatened suicide. (*See* Defs. 56.1 ¶¶ 23–24, 34–35; Pl. Counter 56.1 ¶¶ 23–24, 34–35). Finally, the record indisputably indicates that Culianos knew of Plaintiff's distress about the circumstances surrounding Plaintiff's mother's recent death, (*see* Scheibel Decl. Ex. G ("Dispatcher Call to Culianos") 0:00–0:15 (Dkt. No. 580-7).)

As noted in the Court's previous Opinion ("2023 Opinion") denying Defendants' Motion to Dismiss these claims, the events captured on the August 2020 Recording are not sufficient, on their own, to demonstrate that Defendants had probable cause. *See Barkai v.*

---

[6] Plaintiff argues, and indeed presents evidence, that he was in fact on a business call at the time of his arrest. (Dkt. No. 632.) However, whether Plaintiff was, in fact, on a $130 million call is not relevant to the Court's determination of probable cause. What matters instead is whether Defendants' interpretation of this claim as a "grandiose statement indicative of mental illness," (*see* Defs. Mem. 17), was unreasonable, *cf. Clark v. Sikorski*, No. 16-CV-7744, 2020 WL 469427, at *5 (S.D.N.Y. Jan. 29, 2020) (concluding that an officer had probable cause to arrest the plaintiff for a substance that the officer reasonably believed to be cocaine, even where it was shown that the officer's belief was mistaken); *see also Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008) ("[A] mistake about relevant facts . . . does not undermine the existence of probable cause.").

*Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *24–26 (S.D.N.Y. Mar. 29, 2023) ("As alleged by Plaintiff at this early stage of litigation, it is an open question whether Culianos had sufficient probable cause to believe that Plaintiff was dangerous to himself and others"). However, the Court concludes that taken together, the undisputed facts available at the summary judgment stage are sufficient to demonstrate that Defendants had probable cause to detain Plaintiff pursuant to NYMHL Section 9.14.  The information possessed by Defendants at the time of the seizure demonstrated the requisite "probability" that Plaintiff posed a danger to his own life: he had a known history of mental health incidents, and in particular, threats against his own life; Defendants had information suggesting Plaintiff was going through a difficult period of his life following the death of his mother; and Defendants were told that Plaintiff had renewed his threat to commit suicide that day.  *See MacNeal v. City of New York*, No. 23-CV-5890, 2025 WL 640666, at *7 (S.D.N.Y. Feb. 27, 2025) ("Plaintiff's email threatening suicide provided CCHR and the officers a reasonable basis for believing that Plaintiff was a danger to herself."), *reconsideration denied sub nom*. No. 23-CV-5890, 2025 WL 1018983 (S.D.N.Y. Apr. 4, 2025); *Barkai v. Mendez*, No. 21-CV-4050, 2024 WL 811561, at *17–20 (S.D.N.Y. Feb. 21, 2024) (concluding, inter alia, that Plaintiff's known EDP history, officers' previous interactions with Plaintiff, his emotional distress as a result of the death of his mother, and his threats against himself on the day at issue contributed to a determination of probable cause). Furthermore, the record indicates that Plaintiff entered and exited his home several times in the span of a minute or less, and Plaintiff does not dispute that when he spoke to Donegan, he approached her with his arms up, he told her that he was on a $130 million call, and he told her to get off of his property in a "elevated" and "commanding" voice.  While these actions may not, in themselves, be enough to establish a probability that Plaintiff was likely to hurt himself,

they do contribute to the overall probable cause determination. *See Aouatif v. City of New York*, No. 07-CV-1302, 2019 WL 2410450, at *10 (E.D.N.Y. May 31, 2019) (holding that the defendant was reasonable in concluding that the plaintiff's anger and raised voice suggested that she posed a risk of danger to herself and others, particularly in light of the defendant's knowledge of the plaintiff's past mental health issues), *aff'd*, 811 F. App'x 711 (2d Cir. 2020); *Burdick v. Johnson*, No. 06-CV-1465, 2009 WL 1707475, at *6 (N.D.N.Y. June 17, 2009) (concluding that officers had probable cause to detain the plaintiff where the record suggested that, inter alia, he was extremely upset). The sum of these undisputed facts demonstrates that Defendants possessed probable cause that Plaintiff was a danger to himself. *See Mendez*, 2024 WL 811561, at *17–21 (looking at the facts as a whole to determine that probable cause existed); *see also Jeanty v. City of New York*, No. 23-CV-9472, 2024 WL 5236462, at *17 (E.D.N.Y. Dec. 28, 2024) ("When determining probable cause, courts consider the totality of the circumstances and the facts known to the officer at the time of the arrest." (citing *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012))).

Plaintiff argues that there was no probable cause to detain him because Donegan ignored the "objective fact" that Plaintiff's agitation was caused by Donegan's interruption of his $130 million call. (*See* Pl. Opp. 17.) As noted above, what matters is not what actually caused Plaintiff's irritation, but whether Donegan's *interpretation* of Plaintiff's behavior as erratic and evincing a troubling mental state was reasonable. *See Mastromonaco v. Cnty. of Westchester*, No. 15-CV-10166, 2018 WL 4042111, at *6 (S.D.N.Y. Aug. 23, 2018) (noting that defendant-police officer's mistaken belief about the plaintiff's car smelling like marijuana did not undermine probable cause so long as the belief was reasonable), *aff'd*, 779 F. App'x 49 (2d Cir. 2019); *Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008) ("[A] mistake about

relevant facts . . . does not undermine the existence of probable cause.").  The Court concludes that given the other information Donegan had about Plaintiff (his alleged suicidality and his status as an EDP), it was reasonable of Donegan to believe that Plaintiff's claim that he was on a phone call related to a $130 million dollar deal was a grandiose statement evincing a troubled mental state and thus contributed to probable cause.  This conclusion is supported by the fact that the physician and social worker who treated Plaintiff later that day noted that those same claims suggested that he was in an "extreme state of mania" and that he presented a danger to himself and others.  (*See* Ferrantello Aff. ¶¶ 19, 20, *see also* Ferrantello Aff. Ex. A, at 6 (noting that Plaintiff's immediate risk factors included "danger to self" and "danger to others").)  *See Aouatif*, 2019 WL 2410450, at *10 (noting that the reasonableness of the defendant's assessment of the plaintiff's mental state was substantiated by similar observations made later that day by the plaintiff's doctors).

Plaintiff also argues that the circumstances at issue are most similar to those in *Druss v. Muscatella*, No. 20-CV-06341, 2022 WL 3701085 (S.D.N.Y. Aug. 26, 2022).  (*See* Pl. Opp. 16.)  In *Druss*, a relative called the police station reporting that the plaintiff had stopped taking her medication and was acting erratically. *See id*. at *1.  The plaintiff was subsequently detained by police at her home.  *See id*. at *3.  The court denied summary judgment because all the parties could agree on regarding the events leading to the plaintiff's detention was that "(1) the officers arrived at [the plaintiff's] residence to conduct a welfare check; and (2) the information provided to [the defendants] by CPD, and to CPD by BHRT, indicated that [the plaintiff] had no known violent history and no weapons."  *Id*. at *6.

The undisputed evidence in this case distinguishes this case from *Druss*.  First, unlike the defendants in *Druss*, Defendants in this case had been alerted that Plaintiff was making

violent threats towards himself, not simply that he was behaving erratically.  *See Matthews v. City of New Yor*k, No. 15-CV-2311, 2016 WL 5793414, at *4 (S.D.N.Y. Sept. 30, 2016) (distinguishing the case before the court from another introduced by the plaintiff "because a report of a suicide threat does more to establish probable cause than a report of erratic behavior").  Second, unlike *Druss*, it is undisputed that Plaintiff was the subject of numerous prior welfare checks.  *See generally id*. (no allegations that the defendants had any prior knowledge of the plaintiff's mental health history); *see also Mendez,* 2024 WL 811561, at *17 (concluding that undisputed evidence that the defendants knew of the plaintiff's history of threats of self-harm contributed to a determination of probable cause)*.*  Third, it is undisputed that Culianos knew that Plaintiff was dealing with the death of his mother.  *See Mendez,* 2024 WL 811561, at *17 (concluding that undisputed evidence that the defendants knew of the death of Plaintiff's mother contributed to a determination of probable cause).  Fourth, while some aspects of the interaction that led to Plaintiff's detention are undoubtedly in dispute, it is not disputed that: (i) Plaintiff moved in and out of his home several times within the minute that Donegan arrived on the scene, (ii) when he exited his home to speak to Donegan he spoke to her with his "arms in the air" and in a "commanding" voice, and (iii) when Culianos arrived on the scene, Plaintiff was yelling at Donegan to get off of his property.  The combination of these undisputed facts distinguishes the case at hand from that in *Druss.*

Even assuming, arguendo, that these facts did not amount to probable cause to detain Plaintiff, the Court concludes that they were certainly sufficient to constitute "arguable probable cause," and therefore that Defendants are shielded by qualified immunity.  Even if Defendants were mistaken about Plaintiff's mental state at the time of his detainment, qualified immunity would shield their actions so long as their determinations were not "plainly incompetent" or did

18

not "amount[] to a knowing violation of the law." *See Aouatif*, 2019 WL 241045, at \*11 (citations and quotation marks omitted); *see also Guan*, 37 F.4th at 806 ("[I]f reasonable officers could disagree on the legality of the action at issue in its particular factual context, the officer is entitled to qualified immunity.")  Here, given the undisputed evidence, the Court cannot conclude "that no reasonable police officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that probable cause existed for a mental health arrest." *See Guan*, 37 F.4th at 806.  These facts include: Plaintiff's undisputed behavior at the scene, Plaintiff's undisputed history of making threats against himself, his alleged suicide threat on the day in question, and the officer's knowledge of the recent death of his mother. *See Guan*, 37 F.4th at 806 (determining that the defendants were entitled to qualified immunity where, inter alia, officers were told that the plaintiff needed medical attention, and they witnessed the plaintiff behaving abnormally);  *Mendez*, 2024 WL 811561, at \*22 (concluding the defendants were entitled to qualified immunity where the plaintiff's exact level of agitation at the scene was disputed but where the defendants were aware of a "prior history indicating extreme emotional distress" and where he had made statements "indicating suicidal ideation"); *Jones v. New York*, No. 16-CV-556, 2019 WL 4640151, at \*7 (S.D.N.Y. Sept. 24, 2019) (holding that officers were entitled to qualified immunity because a reasonable officer could conclude that witness's statements, corroborated by the radio dispatch call and the officers' own observation of plaintiff's argumentative and irrational behavior, would be sufficient to lead a person of reasonable caution to believe that plaintiff appeared mentally ill and posed "a probability or substantial chance of dangerous behavior" (citation omitted)); *Sanchez v. Town of Greece*, No. 98-CV-6433, 2004 WL 1964505, at \*4 (W.D.N.Y. Sept. 1,

2004) (holding that officer entitled to qualified immunity after involuntarily hospitalizing plaintiff who behaved bizarrely).

* * *

Accordingly, the Court grants Defendants' Motion and denies Plaintiff's Cross-Motion as to the false arrest claim.

2. <u>First Amendment</u>

Plaintiff also raises a First Amendment challenge against Defendant Culianos.  (*See* FAC ¶ 118.)  Defendants argue that this argument fails because there was probable cause, or at least arguable probable cause, to arrest Plaintiff.  (*See* Defs. Mem. 8.)  The Court agrees.

A plaintiff asserting a First Amendment retaliation claim must establish that: "(1) [his] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [him]; and (3) there was a causal connection between this adverse action and the protected speech." *Balchan v. City Sch. Dist. of New Rochelle*, No. 21-CV-4798, 2023 WL 4684653, at *5 (S.D.N.Y. July 21, 2023) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)).  With respect to the first factor, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Burden v. Inc. Vill. of Port Jefferson*, No. 21-CV-4967, 2023 WL 2632453, at *3 (E.D.N.Y. Mar. 24, 2023) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)).  Accordingly, "[s]peech directed at police officers will be protected unless it is likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." *Lilly v. Town of Lewiston*, 449 F. Supp. 3d 190, 202 (W.D.N.Y. 2020) (quoting *Kerman*, 261 F.3d at 242).  As for the third factor, causality, the retaliatory motive must be a "but-for" cause. *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  In other words, "[i]t is not enough to show that an official

acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the

injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (emphasis omitted). For this reason, "[t]he

presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."

*Dougal v. Lewicki*, No. 23-CV-1167, 2023 WL 6430586, at *8 (N.D.N.Y. Oct. 3, 2023)

(quoting *Nieves*, 139 S. Ct. at 1726), *report and recommendation adopted*, No. 23-CV-1167,

2023 WL 7013384 (N.D.N.Y. Oct. 25, 2023); *see also Higginbotham v. Sylvester*, 218 F. Supp.

3d 238, 245 (S.D.N.Y. 2016) ("The existence of probable cause . . . will defeat a First

Amendment claim 'premised on the allegation that defendants prosecuted a plaintiff out of a

retaliatory motive.'" (alteration adopted) (quoting *Fabrikant v. French*, 691 F.3d 193, 215 (2d

Cir. 2012))), *aff'd sub nom. Higginbotham v. Sylvester*, 741 F. App'x 28 (2d Cir. 2018)

(summary order).

    In another case before this Court, *Mendez*, Plaintiff raised a false arrest and First

Amendment retaliation claim after being found to be a danger to himself during the course of a

traffic stop and transported to a hospital for treatment. *See Mendez*, 2024 WL 811561, at *3–

10. At summary judgment, the Court concluded that Defendants had probable cause and

granted summary judgment as to Plaintiff's false arrest claim. *See id*. at *15–22. The Court

then determined that Plaintiff's First Amendment retaliation claim failed "based on the Court's

conclusion that there was probable cause, or, at least, arguable probable cause, to arrest

Plaintiff." *See id*. at *23.

    Though the factual circumstances in *Mendez* are distinct from those at issue here, the

same logic applies to both cases. Here, as in *Mendez*, the Court concludes that Defendants had

probable cause, or at least arguable probable cause, to detain Plaintiff. (*See* supra II.B.1.) *See*

*Mendez*, 2024 WL 811561, at *23. For that reason, the Court grants summary judgment on

Plaintiff First Amendment retaliation claim. *See Mendez*, 2024 WL 811561, at *23 ("Defendants are entitled to summary judgment as to Plaintiff's First Amendment retaliation claim based on the Court's conclusion that there was probable cause, or, at least, arguable probable cause, to arrest Plaintiff."); *Boykin v. City of New York*, No. 21-CV-1362, 2022 WL 4585299, at *4 (S.D.N.Y. Sept. 29, 2022) (dismissing plaintiff's First Amendment retaliation claim where Court had already determined that there was probable cause to support plaintiff's arrest), *aff'd*, No. 22-2675, 2023 WL 7383147 (2d Cir. Nov. 8, 2023) (summary order); *Burdick v. Swarts*, No. 12-CV-1711, 2019 WL 1409938, at *10 (N.D.N.Y. Mar. 28, 2019) (granting defendant summary judgment as to the plaintiff's First Amendment retaliation claim because defendant was entitled to qualified immunity for charging Plaintiff and initiating the prosecution on the basis of arguable probable cause); *Collins v. City of New York*, 295 F. Supp. 3d 350, 368 (S.D.N.Y. 2018) (holding that "[b]ecause the Court ha[d] already concluded that the [d]efendants had arguable probable cause to arrest the [p]laintiffs . . . the Court [found] that the [d]efendants [were] entitled to qualified immunity on [p]laintiffs' First Amendment retaliation claim on the basis of that same arguable probable cause" (citation omitted)).

### 3. *Daubert* Motion

Plaintiff moves to strike the expert report of John Monaghan. (*See* Pl. Daubert Mem.) Defendants oppose this Motion. (*See* Defs. Daubert Opp.) Because the Court grants Defendants' Motion for Summary Judgment, and because it does not rely on Monaghan's expert report in making this determination, (*see* supra II.B.1–2), the Court need not address Plaintiff's motion to strike, *see In re Int. Rate Swaps Antitrust Litig.*, No. 16-MD-2704, 2023 WL 8675625, at *3 n.3 (S.D.N.Y. Dec. 15, 2023) (denying the plaintiffs' motion to strike the defendants' expert as moot where the plaintiffs' motion to certify was denied and the court did

not rely on defendants' expert in making that determination); *Phelps v. CBS Corp.*, No. 17-CV-8361, 2021 WL 4226037, at *1 (S.D.N.Y. Sept. 16, 2021) (denying the defendant's *Daubert* motion where the court granted the plaintiff's motion for summary judgment without relying on the plaintiff's experts).

    4.  <u>State Law Claims</u>

Finally, because the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's federal law claims, it declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. *See King v. Nesto*, No. 19-CV-1466, 2023 WL 2456701, at *6 (D. Conn. Mar. 10, 2023) ("The district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction. (quoting 28 U.S.C. § 1367(c)(3))); *St. Pierre v. Tawanna*, No. 14-CV-1866, 2018 WL 4078274 *17 (D. Conn. Aug. 27, 2018) (declining to exercise supplemental jurisdiction after granting summary judgment in favor of the defendants on federal law claims).

### III.   <u>Conclusion</u>

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment and thus necessarily denies Plaintiff's Motions. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 576, 592, 593, 598, 611, 625), enter judgment for Defendants, close the case, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:      September 19, 2025
           White Plains, New York

_____
KENNETH M. KARAS
United States District Judge